Present:  All the Justices

LASZLO N. TAUBER, ET AL.

OPINION BY JUSTICE A. CHRISTIAN COMPTON
v.  Record No. 971155                April 17, 1998

COMMONWEALTH OF VIRGINIA,
ETC., ET AL.

FROM THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA
Alfred D. Swersky, Judge

In this chancery suit, the Attorney General of Virginia and a commonwealth's attorney jointly assert jurisdiction in the name of the Commonwealth over assets located in Virginia held by trustees in dissolution of a foreign charitable corporation. The trustees had been directors of the corporation, which operated a hospital in this State.

A brief summary of the relevant business activities of the hospital directors will set the stage for this discussion. Jefferson Memorial Hospital, Inc. (JMHI), was chartered originally as a for-profit, stock corporation in Maryland in 1963.  In 1964, the corporation amended its charter to become a nonprofit, nonstock charitable entity; it began operations as an acute-care hospital in Alexandria on March 15, 1965.

In April 1969, the federal Internal Revenue Service began an investigation leading to revocation of JMHI's tax-exempt status, retroactive to November 1, 1965.  In 1971, the corporation's directors attempted to "merge" JMHI into a for-

profit Delaware corporation, Jefferson Memorial Hospital Corporation (JMHC). There was an effort to dissolve JMHI and to transfer its assets and liabilities to JMHC, of which JMHI's directors would serve as directors.

In April 1973, Maryland ordered JMHI's corporate charter forfeited "for failure to file the necessary corporate personal property report or failure to pay any late filing penalties due."

In 1974, the directors retained counsel "to represent the Hospital in looking after and insuring that the Hospital Corporate structure for the past, present, and for the immediate future, be handled so as to insure that everything is legally correct and in keeping with the best interest of the investors of the Hospital," according to JMHC's minutes. Counsel testified that he was "asked to rectify the problem that had arisen because a supposed merger in '71 had not been done."

Unaware that Maryland had revoked JMHI's charter, counsel had the directors declare JMHI insolvent and approve transfer of JMHI's assets to JMHC. In January 1975, JMHC's directors authorized purchase of the assets and assumption of the liabilities. The directors of JMHC, believing they had assembled all the assets of the former charity into the for-profit corporation, agreed to transfer all JMHC's "assets" to appellant Laszlo N. Tauber as trustee for appellant Jefferson

2

Memorial Hospital Joint Venture (JMHJV), a partnership in which those assets apparently still reside. The directors also agreed to lease back from the partnership the transferred assets.

In July 1996, the present suit was instituted by the Commonwealth of Virginia, ex rel. the Attorney General of Virginia and the Commonwealth's Attorney for the City of Alexandria. The defendants are Tauber and nine other named physicians, "each individually and as a former director of [JMHI] . . . and/or as partners in Jefferson Memorial Hospital Associates, or [JMHJV], and/or directors or shareholders of [JMHC] (a Delaware Corporation now known as 'Jefferson Corporation of Alexandria')"; Jefferson Memorial Hospital Associates; JMHJV; and Jefferson Corporation of Alexandria. A prior suit had been commenced by the Attorney General against the same defendants in April 1995, but was nonsuited during trial.

In the present suit, the plaintiffs filed a 112-paragraph, 40-page, three-count bill of complaint. They alleged that funds and assets received by the defendants as directors and trustees of a charitable corporation "were misappropriated and diverted" contrary to law that requires such funds to be used only for charitable purposes, "and not for private inurement." The plaintiffs then recited in detail the defendants' alleged business activities in connection with the hospital.

3

In count one, the plaintiffs alleged the "purported merger between JMHI and JMHC in 1971 never took place," and the "subsequent purported transfers of the property of JMHI were likewise null and void."  Asserting "JMHI was and is a non-stock foreign corporation whose assets are located in the Commonwealth" and are subject to the trial court's jurisdiction, the plaintiffs asked the court:  to declare "that the purposes for which JMHI was created have been frustrated and are no longer capable of being accomplished by virtue of" the defendants' conduct; to declare that legal title to JMHI's assets remain in JMHI; to order that an appropriate custodian gather the assets of the former JMHI and administer them under the court's supervision; to require that defendants account for the money or other value received in the transactions and that defendants be surcharged for the charitable assets they usurped in the amount of at least $40 million; and to enter judgment against defendants as a result of "their conversion, misappropriation, or appropriation of the charitable assets" described.

In count two, the plaintiffs sought similar relief and also asked the court "to impose a constructive trust upon the Hospital, its land, equipment and any other assets," as well as upon settlement proceeds being paid by an entity which, in 1985,

4

negotiated with JMHJV to buy the right to operate the hospital and its assets as a going concern.

In count three, the plaintiffs asked the court to declare that "the corporate opportunities of JMHI have been usurped" by the defendants; that the defendants be required "to account for and disgorge all sums usurped;" that the court impress upon any future sums defendants may receive "an appropriate judgement or trust to secure the interests of the beneficiaries of JMHI, and, if necessary, to refer the matter to a Commissioner in Chancery for an appropriate accounting and charging order against JMHJV."

After the chancellor overruled their demurrer and plea in bar, defendants answered the bill of complaint. They generally denied the allegations, asserting the plaintiffs are not entitled to the relief prayed for, or to any other relief.

The cause was heard ore tenus in January 1997. The parties had stipulated that the trial in the present suit was to commence where the prior trial terminated, and that the record of all proceedings in the prior suit is to be a part of the present record.

Following the trial, the chancellor filed a memorandum opinion ruling that the plaintiffs are entitled to relief sought in the bill of complaint. In a March 1997 decree, from which we awarded defendants this appeal, the court declared that the assets and liabilities of JMHI "be, reside and remain with

5

[defendants] as trustees and further that a constructive trust be . . . imposed on such assets and liabilities."

The court also ordered that a custodian "be appointed with exclusive jurisdiction to hold and administer the said assets and liabilities."  Additionally, the court ordered defendants to submit "a full and complete accounting of all assets and liabilities that are the subject of this Decree."  Finally, the court denied the plaintiffs' "claim for monetary damages."

On appeal, defendants contend the trial court erred "when it concluded that the Attorney General has authority to bring this suit."  The chancellor ruled "that the Attorney General has standing and authority to bring this action both at common law and pursuant to" Code § 13.1-909(B).  The trial court is correct.

We need address only the common law.  This Court long ago recognized the common law authority of the Attorney General to act on behalf of the public in matters involving charitable assets.  Clark v. Oliver, 91 Va. 421, 427-28, 22 S.E. 175, 177 (1895).  Indeed, this authority has received legislative recognition as recently as last year.  During its 1997 session, the General Assembly granted the Attorney General additional specific powers with respect to the disposition of assets by nonprofit health care entities.  Acts 1997, ch. 615.  These powers were granted "in order that the Attorney General may

6

exercise his common law and statutory authority over the activities of these organizations."  Code § 55-532.

Next, defendants argue the chancellor erred in ruling that Code § 55-29 provides authority for the Commonwealth's Attorney of the City of Alexandria to be a proper party to the claims asserted.  We disagree.

Code § 55-29 (1995 Repl. Vol.) provides, as pertinent:

> "When any such gift, grant or will is recorded and no trustee has been appointed, or the trustee dies or refuses to act, the circuit court . . . of the city in which the trust subject or any part thereof is, in the case of a gift or grant, or in which the will is recorded, may, on motion of the attorney for the Commonwealth in such court (whose duty it shall be to make such motion), appoint one or more trustees to carry the same into execution. . . . In enforcing the execution of any such trust a suit may be maintained against the trustees in the name of the Commonwealth when there is no other party capable of prosecuting such suit.  The term 'trustees' as herein used shall be construed to mean the persons, or governing body, charged with the execution of the trust, whether designated as 'trustees,' 'directors' or otherwise. . . ."

The phrase "any such gift, grant or will" refers to Code § 55-26.1, which provides, "Every gift . . . made hereafter for charitable purposes, whether made in any case to a body corporate or unincorporated . . . shall be as valid as if made to or for the benefit of a certain natural person. . . ."

The foregoing provisions are not limited to express trusts arising by virtue of written instruments, as defendants argue, but apply, as here, when the assets of JMHI passed automatically

7

to its directors as formal trustees of the charitable organization in liquidation.  Thus, the Commonwealth's Attorney is a proper party to this litigation.

Parenthetically, because the defendants seem to raise this issue on brief, we note that use of the word "recorded" in the first clause of the first sentence of § 55-29 refers to recorded wills, and not to any requirement that gifts or grants also be recorded.  This is made clear later in the same sentence where there is specific reference to "in which the will is recorded."

Next, we shall turn to the merits.  A detailed recitation of the evidence gleaned from this record would serve no useful purpose.  On appeal, the defendants primarily seek to have us annul factual findings of the chancellor.  The evidence, except for opinions of experts, was not in dispute; defendants urge us to invalidate the legitimate inferences drawn by the trial court from those proven facts.  This tactic will not succeed upon appellate review.

The findings of a chancellor, hearing evidence ore tenus, carry the weight of a jury verdict.  Giannotti v. Hamway, 239 Va. 14, 23, 387 S.E.2d 725, 730 (1990).  A judgment based upon such findings will not be annulled on appeal "unless it appears from the evidence that such judgment is plainly wrong or without evidence to support it."  Code § 8.01-680.  And, the plaintiffs' burden is to prove these allegations by a preponderance of the

8

evidence.  Baylor v. Beverly Book Co., 216 Va. 22, 24, 216 S.E.2d 18, 19 (1975).

Upon review we shall recite the facts, including the legitimate inferences flowing from those facts, in the light most favorable to the plaintiffs, who prevailed below.  In the early 1960s, following acquisition of real estate by deed and lease by King Street Joint Venture, held by defendant Tauber as trustee, JMHI was formed to transact the business of operating a hospital.  This Maryland corporation was authorized to do business in Virginia in 1963.  Following the March 1965 opening, the hospital experienced "problem[s] all the time," although an expansion allowing addition of 24 beds occurred in 1968.

In 1970, during the Internal Revenue Service investigation, an attorney was retained to review "the current corporate status of the hospital."  Counsel recommended "a complete reorganization of the hospital and its affiliates," establishment of "a new profit corporation with the same name," and "that the old non-profit corporation be merged into it."

The Delaware for-profit corporation, JMHC, was formed in 1971 and a supposed merger was arranged.  This merger was reported on tax returns filed in 1972, but the record is devoid of documents to support such a transaction.  However, Dr. Tauber, who mainly orchestrated the myriad transactions involved in this case, testified, "In my own mind, [the merger] was

completed."  The chancellor said no evidence had been presented to show due diligence was used at that time to protect the interests of the beneficiaries of the charitable hospital.

The basis of the 1972 Internal Revenue Service ruling revoking JMHI's tax-exempt status was:  "The hospital sold 8% bonds to various doctors and individuals in exchange for their 6% demand notes and did not enforce collection of such demand notes.  Other hospital bonds were sold to the general public at 8% for cash.  Some of the doctors receiving the 8% bonds in exchange for their 6% demand notes were officers, directors, and staff members of the hospital.  Issuance of 8% bonds to these doctors and failure to enforce collection of the demand notes received in exchange resulted in <u>inurement of income to private individuals</u>."  This was a violation of the applicable provision of the Internal Revenue Code allowing exemption of charities from federal income taxation.

In 1974, after another attorney had been retained "to rectify the problem that had arisen" because of the putative merger, documents indicate that JMHC assumed the charity's liabilities in return for receipt of JMHI's assets.  The charity was to receive 5,000 shares of JMHC stock, but no such transfer was made.

The record amply supports the following findings of the chancellor.  "There are numerous transactions shown, some of-

10

record and some not, dealing with the real estate, the equipment, the leases, and the use of tax benefits. The transactions show an entire course of self-dealing by the directors of the charity. They were able to acquire interests in the real estate, the equipment and lease, and were able to use tax benefits belonging to the former charity to enhance the gain of the for-profit corporation. The record is replete with discussions among [defendants] as to their personal profits and gains with no reference to the best interests of the beneficiaries nor of the charitable corporation. The result was the total obliteration of the non-profit corporation."

A transaction illustrative of the foregoing conclusions involves a subdivision of the hospital's real estate in 1970. The charity's 65% undivided interest was lost and, in its place, the charity obtained a 20% interest consisting of an allocated parcel. Also, after the nonprofit corporation was dissolved by Maryland authorities in 1973, defendants caused the filing of an annual report with the State Corporation Commission of Virginia that JMHI remained in good standing.

As the chancellor found, deals were "convoluted and complex with off-record real estate transactions conflicting with the state of the title as shown on-record. Net operating losses were used as tax deductions by JMHC that had become deductions [as] a result of the revocation of JMHI's tax exempt status.

When [defendants] had exhausted these deductions, they began seeking ways to benefit their own tax status through a complicated series of notes and bonds, and while some personal risk was taken, the [defendants] and others were participating in the venture in basically a risk-free manner."

Defendants claimed in the trial court that JMHI had no value in 1971 and, thus, the transactions by which they assumed control of its corporate assets by the assumption of its liabilities were "fair." Responding, the chancellor determined that JMHI "had value as a 'going concern'" when the effort was made to change to a for-profit corporation. But the court concluded that defendants' expert testimony was more persuasive than plaintiffs' and that "the value of the corporation did not exceed its liabilities." "However," the chancellor ruled, "this does not constitute a defense to the claims made here."

The defendants' contentions regarding the merits of the suit, including the arguments advanced by amici curiae supporting defendants, are premised upon several erroneous conclusions. For example, defendants believe the trial court recognized that a legally valid "transaction" of some sort occurred in 1971.

Defendants' description of the nature of this binding "transaction" has evolved from "merger," to "reorganization," and finally, during oral argument of the appeal, to

"acquisition."  Also, defendants and their supporters think this case involves the improper meddling by the Commonwealth into the internal affairs of a Maryland corporation, contrary to settled law and violative of the Full Faith and Credit, Due Process, and Commerce Clauses of the United States Constitution.  This case involves none of the above.

The trial court determined that no transaction in the nature of a merger or reorganization took place in 1971.  The chancellor ruled that "no merger of JMHI and JMHC has occurred and that the transactions by directors of JMHI are void, the assets remained in JMHI until its dissolution.  At the time of dissolution, these assets passed into and remain in the hands of [defendants] as trustees."  This ruling is fully supported by the applicable law and the uncontradicted evidence, most of which was created by defendants.

Because the 1971 "transaction" never occurred, the 1973 revocation of JMHI's corporate charter converted its directors by operation of law to trustees in dissolution under Maryland law.  Md. Code Ann., Corporations Art. 23, § 78(a) (1957); Cloverfields Improvement Ass'n v. Seabreeze Properties, Inc., 373 A.2d 935, 939-40 (Md. 1977).  Virginia law was and is the same.  See former Code § 13.1-254 (1973 Repl. Vol.); present Code § 13.1-915 (1993 Repl. Vol.).

13

The charter revocation terminated JMHI's corporate existence and powers, and it could no longer function as a corporation. Cloverfields Improvement Ass'n v. Seabreeze Properties, Inc., 362 A.2d 675, 679 (Md. App. 1976). From that day forward, the defendants' actions purportedly taken as corporate officers, and not done to wind up or liquidate the business, were without effect because there was no corporation for which to act. The corporate assets had automatically transferred to the directors as trustees. Cloverfields, 362 A.2d at 679.

Under Maryland law, property of a charitable corporation is held in trust for the public. Inasmuch Gospel Mission, Inc. v. Mercantile Trust Co. of Baltimore, 40 A.2d 506, 510 (Md. 1945). Virginia law is the same. "The corporation was organized for charitable or benevolent or literary purposes. Contributions made to it and the assets realized therefrom were dedicated to those purposes and stamped with a public interest by the charter, the laws of this State, sound reason and public policy. The members acquired no property rights in, nor were they equitably entitled to such assets, either during the lifetime of the corporation or upon dissolution. To hold otherwise would convert the public nature and purpose of the corporation into a vehicle for the personal pecuniary gain of the members." Hanshaw v. Day, 202 Va. 818, 824, 120 S.E.2d 460, 464 (1961).

14

Thus, the defendants' contentions that this litigation, dealing with appropriation of charitable assets by directors for their personal gain, involves impermissible interference by Virginia with the internal affairs of a foreign corporation, or that a "fairness" doctrine should be applied to the 1971 activities, are without merit.

Accordingly, the circuit court properly exercised its authority to insure that these assets, now held by the defendants as trustees in liquidation, are distributed in accord with the charitable purposes to which they should have been devoted. This power to liquidate the assets and business of a nonstock corporation may be exercised over the property within the court's jurisdiction "of a foreign corporation that has ceased to exist." Code § 13.1-909(B). See former Code § 13.1-257(e) (1973 Repl. Vol.). The corporate facilities were located solely within this State in Alexandria.

Thus, we hold the trial court did not err in taking charge of the liquidation of the assets of this dissolved foreign corporation, and in providing the relief outlined in the order from which this appeal was taken. This record clearly demonstrates that the directors of JMHI, now trustees in dissolution, have failed and refused to execute the trust.

Finally, we have considered, and reject, defendants' other arguments. Only one of those contentions merits discussion.

Defendants argue the trial court erred in not sustaining its plea based on the doctrine of laches.

Laches may not be pled successfully as a defense in an equitable proceeding to bar the State from asserting a claim on behalf of the public.  Board of Supervisors of Tazewell County v. Norfolk and W. Ry. Co., 119 Va. 763, 790, 91 S.E. 124, 133 (1916).  Accord City of Manassas v. Board of Supervisors of Prince William County, 250 Va. 126, 132, 458 S.E.2d 568, 571 (1995).  See Dick Kelly Enter. v. City of Norfolk, 243 Va. 373, 381, 416 S.E.2d 680, 685 (1992).  As we already have said, this cause is brought by the Commonwealth on behalf of the public to hold and administer charitable assets.  Hence, laches does not apply.

Consequently, we will affirm the judgment appealed from, an interlocutory decree adjudicating the principles of the cause, and we will remand the cause to the trial court for further proceedings.

                                        Affirmed and remanded.