PRESENT:  All the Justices

LASZLO N. TAUBER, ET AL.

v.  Record No. 011150    OPINION BY JUSTICE BARBARA MILANO KEENAN
                                    April 19, 2002
COMMONWEALTH OF VIRGINIA, EX REL.
JERRY W. KILGORE, ATTORNEY GENERAL
OF VIRGINIA, ET AL.

              FROM THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA
                      Alfred D. Swersky, Judge

     In this appeal, we consider issues related to an accounting

of the assets of a defunct charitable corporation.  The

chancellor awarded $20 million and certain real property to the

Commonwealth for the public benefit after imposing a

constructive trust on the assets of the corporation whose

charter was revoked in 1973.

     We initially considered issues arising from the diversion

of assets of Jefferson Memorial Hospital, Inc. (JMHI) in Tauber

v. Commonwealth, 255 Va. 445, 499 S.E.2d 839 (1998) (Tauber I).

There, we affirmed the chancellor's judgment imposing a

constructive trust on the assets of the defunct charitable

corporation and we remanded the case to the chancellor for

further proceedings.  Id. at 450-51, 456, 499 S.E.2d at 842,

845.  We will recite the relevant facts in the proceedings to

date, including the inferences fairly deducible from those

facts, in the light most favorable to the Commonwealth, the

prevailing party below.  Id. at 452, 499 S.E.2d at 843; Hoffman

Family, L.L.C. v. Mill Two Assocs. P'ship, 259 Va. 685, 696, 529 S.E.2d 318, 325 (2000).

Our standard of review on appeal is well established. As the trier of fact, the chancellor evaluated the testimony and the credibility of the witnesses. Johnson v. Cauley, 262 Va. 40, 44, 546 S.E.2d 681, 684 (2001); Advanced Marine Enters., Inc. v. PRC Inc., 256 Va. 106, 120, 501 S.E.2d 148, 156 (1998). Therefore, we will not set aside his findings on appeal unless they are plainly wrong or without evidence to support them. Nelson v. Davis, 262 Va. 230, 234, 546 S.E.2d 712, 715 (2001); Hudson v. Pillow, 261 Va. 296, 302, 541 S.E.2d 556, 560 (2001).

## I. BACKGROUND FROM TAUBER I

In the early 1960s, King Street Joint Venture (KSJV), through Laszlo N. Tauber, M.D., as trustee, acquired by deed and lease certain parcels of real estate located in the City of Alexandria. In 1963, JMHI obtained a charter in the state of Maryland as a "for-profit" corporation for the purpose of operating a hospital in Alexandria to be built on the acquired parcels of real estate. In 1964, JMHI amended its corporate charter to become a non-profit corporation and began operating the new hospital the following year. In 1966, KSJV was dissolved and its assets were transferred to Jefferson Memorial Hospital Associates (JMHA), a partnership conducted by Tauber as trustee.

2

In 1971, Jefferson Memorial Hospital Corporation (JMHC), a Delaware "for-profit" corporation, was formed and acquired the assets and liabilities of JMHA. Soon thereafter, a purported merger was attempted between JMHC and JMHI. As we observed in Tauber I, while "[t]his merger was reported on tax returns filed in 1972, . . . the record is devoid of documents to support such a transaction." Id. at 453, 499 S.E.2d at 843.

Also in 1972, the Internal Revenue Service issued a ruling revoking JMHI's tax-exempt status, retroactive to 1965, finding that JMHI engaged in transactions that resulted in "inurement of income to private individuals," in violation of Internal Revenue Code provisions allowing charitable corporations exemption from federal income taxation. In 1973, Maryland revoked JMHI's corporate charter.

In 1975, JMHC purportedly purchased the assets and assumed the liabilities of JMHI. The directors of JMHC thereafter authorized the transfer of all JMHC's assets to Tauber as trustee for Jefferson Memorial Hospital Joint Venture (JMHJV), "a partnership in which those assets apparently still reside." Id. at 449, 499 S.E.2d at 841. That same year, JMHJV "leased back" the transferred assets to JMHC.

In 1982, JMHC subleased Jefferson Memorial Hospital's operating license, liabilities, plant, equipment, and tangible and intangible assets to Health Group of Virginia, Inc. (HGV), a

3

Tennessee corporation, for ten years in exchange for annual payments of about $1 million.  A maximum of $240,000 of this amount was allocated toward payment of lease obligations owed to JMHJV, including payment of the $1.4 million mortgage that JMHJV had assumed from JMHI as part of the 1975 purported sale and "leaseback" transaction.

JMHJV amended its lease with JMHC to provide that JMHC would assign the proceeds from its sublease with HGV to JMHJV, except for the first $100,000 annually, in effect increasing JMHC's rental payments from $240,000 to $900,000 per year.  Following the execution of this lease amendment, JMHJV built a new office building and garage complex (the Beauregard Building).  JMHC later changed its name to Jefferson Corporation of Alexandria (JCA).

In 1985, Tauber alleged that HGV had breached the terms of its lease and negotiated a termination and buy-out of the 1982 agreement by Fairfax Hospital Systems (INOVA).  INOVA acquired HGV's stock for $5.8 million.  In a lease agreement with JCA, in exchange for the operating license rights of the hospital, INOVA agreed to pay annual rent of about $1,375,000 under provisions that escalated to about $2.2 million in the year 2005.  On the same date the INOVA lease was executed, JCA assigned "all of its right, title and interest" in the INOVA lease to Tauber as trustee for JMHJV.

4

In 1992, INOVA discovered problems in the chain of title to the hospital, which ultimately resulted in litigation between INOVA and JMHJV.  In 1994, INOVA and JMHJV reached a settlement agreement (the 1994 INOVA Agreement), in which INOVA purchased all rights to operate the hospital, including the right to terminate hospital operations.  Under the 1994 INOVA Agreement, possession of the land and hospital building reverted to JMHJV. In exchange for the operating license rights of the hospital, INOVA agreed to pay JMHJV over $2 million per year, with a final payment of $10 million in 2005.

In 1996, the Commonwealth of Virginia, ex rel. the Attorney General of Virginia and the Commonwealth's Attorney for the City of Alexandria (collectively, the Commonwealth), filed an amended bill of complaint against Tauber and nine other physicians. Each was sued "individually and as former directors and/or trustees and/or trustees in liquidation of [JMHI] . . . and/or its successors in interest, and/or as partners in [JMHA] . . . or [JMHJV], . . . and/or directors or shareholders of [JMHC] (a Delaware Corporation which changed its name to 'Jefferson Corporation of Alexandria')" (collectively, the defendants). The defendants also included JMHA, JMHJV, and JCA, as well as Tauber in his capacity as trustee and agent for JMHA and JMHJV.

In its amended bill of complaint, the Commonwealth alleged that the 1971 purported merger between JMHI and JMHC never

5

occurred. The Commonwealth asked that the chancellor declare, among other things, that the defendants usurped JMHI's corporate opportunities and, thus, that legal title to JMHI's assets remained in JMHI. The Commonwealth also requested that the chancellor impose a constructive trust on the hospital building, the underlying land, equipment, and assets, and on the proceeds from the 1994 INOVA Agreement.

The chancellor held that the Commonwealth was entitled to the relief sought in its bill of complaint. In a March 1997 order, the chancellor declared that "the assets and liabilities of [JMHI] be, reside and remain with [the defendants] as trustees and further that a constructive trust be . . . imposed on such assets and liabilities." The chancellor also ordered the defendants to submit "a full and complete accounting of all assets and liabilities" that were subject to the chancellor's ruling.

In Tauber I, we affirmed the chancellor's judgment. Id. at 456, 499 S.E.2d at 845. We stated, in relevant part:

> The record amply supports the following findings of the chancellor. "There are numerous transactions shown, some of-record and some not, dealing with the real estate, the equipment, the leases, and the use of tax benefits. The transactions show an entire course of self-dealing by the directors of the charity. They were able to acquire interests in the real estate, the equipment and lease, and were able to use tax benefits belonging to the former charity to enhance the gain of the for-profit corporation. The record is replete with discussions among [defendants] as to their

6

> personal profits and gains with no reference to the best interests of the beneficiaries nor of the charitable corporation. The result was the total obliteration of the non-profit corporation."

Id. at 453-54, 499 S.E.2d at 843-44. We held that after the 1973 revocation of JMHI's corporate charter, by operation of law, JMHI's directors became trustees in dissolution of the charity. Id. at 455, 499 S.E.2d at 844. We stated that any actions thereafter taken by the defendants "as corporate officers, and not done to wind up or liquidate the business, were without effect because there was no corporation for which to act." Id., 499 S.E.2d at 844-45. We also concluded that the record clearly demonstrated that the defendants "failed and refused to execute the trust," and we remanded the case to the chancellor for further proceedings. Id. at 456, 499 S.E.2d at 845.

## II.  EVIDENCE ON REMAND

On remand, the chancellor considered evidence concerning the value of JMHI's assets that were subject to the constructive trust. The record included the testimony of Celeste B. Vella, an attorney who testified in the original proceedings before the chancellor and qualified as an expert witness in the field of real estate transactions and title issues. Vella testified that JMHI owned the beneficial interest in several parcels of realty, including a portion of land that overlaps "Hopkins Parcel 1" and

7

"Hopkins Parcel 2," a 65% undivided interest in the totality of Hopkins Parcels 1 and 2, and the "Berman Parcel."

Vella stated that she used the term "improvements" to refer to the buildings erected on the various properties, and that a majority of the hospital improvements were constructed on Hopkins Parcels 1 and 2. Vella observed that JMHA's financial statement and tax return for 1971 indicated that JMHA transferred ownership of the hospital improvements to JMHI on June 30, 1971. She also stated that JMHC's financial statement for 1971 indicated that JMHC acquired JMHA on July 1, 1971, one day after the improvements were transferred to JMHI. Vella testified that in her opinion, title to both the land and the improvements JMHI owned in 1971 still remained in JMHI at the time of trial.

Vella also concluded that JMHI owned the beneficial interest in all the structures, including the hospital building, which were located on Hopkins Parcels 1 and 2 and the Berman Parcel. She stated that her opinion was based on an examination of record deeds, "off-record" deeds, leases, purchase agreements, corporate documents, federal tax returns, financial statements, letters, and the defendants' answers to interrogatories filed in the case.

Vella noted that, in 1975, JMHI purportedly conveyed its interest in a smaller portion of the above properties to JMHC,

8

which in turn purportedly conveyed that portion to Tauber as trustee. However, Vella concluded that this transaction was void because JMHI no longer existed as a corporation after its 1973 charter revocation and "the appropriate parties were not joined in the deed in order to effect conveyance." In explaining her conclusion, Vella stated that "in order for the directors to act pursuant to a forfeited corporate charter, they would have to make this decision as trustees. And it appears from the minutes that they were acting as if JMHI still existed."

The Commonwealth also presented the testimony of Robert E. Wilson, a certified public accountant employed by Arthur Andersen LLP. Wilson stated that he conducted a fiduciary accounting of JMHI's assets based on the requirements specified in the chancellor's March 1997 decree, which directed disclosure of "all rents, issues, profits, accretions, and benefits, tangible and intangible, which have accrued therefrom." Wilson also explained that in conducting the accounting, he used a "conservative" approach that resolved any doubt in favor of the defendants.

Wilson testified that the right to operate the hospital and to generate income, which was secured by the hospital's operating license, was an asset subject to the constructive trust because JMHI never surrendered ownership of that license.

He explained that "[t]he operating license is the engine . . . that runs this hospital.  The bricks and mortar are simply the chassis.  The value is in the license."

Wilson concluded that "[t]he reorganizations of the Hospital's operating entity appeared to be done with the primary intent of creating financial gain for the original investor group."  He stated that the defendants' actions "stripped" JMHI of much of its value and severely undercapitalized the operation of the hospital.  He explained that these actions required the charity "to absorb the burden of being a tenant . . . at a cost . . . in excess of what it would have been" had the charity owned and operated its own infrastructure, which purportedly had been transferred to the defendants' other "for-profit" enterprises.

Wilson stated that the defendants made only a single capital contribution to the charity, and that there were "many instances" in which they had received a return on their original investment "many times over."  He also determined that the defendants commingled their personal funds with the assets of the charity, and that the activities of JMHJV "served to impair the fiscal stability of JMHI."

Wilson calculated the income generated from the assets held in trust by the defendants as trustees in dissolution, including the proceeds from the HGV and INOVA transactions and the 1994

10

INOVA Agreement. Wilson's calculations showed that as of June 30, 1999, JMHI had realized assets in the amount of $26,372,438 that were subject to the constructive trust. Wilson further determined that an additional $24,703,145 would accrue to the benefit of the constructive trust from July 1, 1999 through October 1, 2005, when INOVA is required to make final payment under the terms of the 1994 INOVA Agreement.

Wilson also addressed the methodology used by the defendants in the accounting they submitted to the chancellor. He testified that the defendants' submission was not a fiduciary accounting because it did not reflect what actually had transpired with regard to JMHI's assets. Wilson stated that he did not see evidence of "any recognition given to the accretion of any of the charity's assets at any point in time," and that the defendants did not account for the net operating losses of the charity. He described the defendants' methodology as the act of choosing four dates and attempting "to create a value judgment or estimation of value based upon the creation of balance sheets which have one foot in reality and one foot in hypothesis."

Wilson explained that valuation is relevant only "if you are winding up and liquidating a business, disposing of assets and liabilities." He stated that because JMHI was never "wound-

11

up" or liquidated, "any valuation information at any point in time is nothing more than a reflection of what might be."

The defendants' accounting, prepared by Arthur H. Cobb, reported JMHI's assets only through 1973, when JMHI's corporate charter was revoked. Cobb also prepared value calculations that were based on certain assumptions, including the assumption that JMHI was liquidated in the alternative years of 1975, 1982, 1992, and 2005.

Cobb testified that JMHI was "undercapitalized" and had received only "one formal capital contribution," which was repaid within two years. He also stated that the hospital was merely a "white elephant" if its assets were considered apart from its operating license.

Cobb's accounting indicated that a liquidation of JMHI in April 1973 would not have yielded any net proceeds, because total liabilities would have exceeded total assets. Cobb reached a similar conclusion for the hypothetical liquidation of JMHI on July 1, 1975, the date of the sale and "leaseback" transaction with JMHJV. He also estimated that a hypothetical liquidation of JMHI in 1982, at the time of the HGV transaction, would have resulted in about $1,254,000 in net proceeds.

Cobb prepared calculations involving a hypothetical liquidation year of 1992, "based on JMHI participating in leasing or sub-leasing certain land, building and related

12

equipment, furniture and fixtures" to HGV and to INOVA. Under this assumption, Cobb estimated that liquidation of JMHI's business at the end of 1992 would have resulted in about $5,462,000 in net proceeds.

Using a hypothetical liquidation year of 2005, Cobb estimated the value of JMHI's assets including, among other things, payments that JMHI would receive from INOVA pursuant to the 1994 INOVA Agreement. Cobb estimated that a liquidation of JMHI's business in September 2005 would result in net proceeds of about $21,944,511. He estimated that the "present value" of this amount in December 1999 was between $4,646,000 and $10,347,000, depending on various annual rates of return. However, Cobb did not include in his calculations the $10 million payment due from INOVA on October 1, 2005.

Tauber testified concerning the buildings and building additions built by the partnerships KSJV, JMHA, and JMHJV. His testimony primarily addressed the cost, rather than the source of the funds used, for the improvements constructed. He stated that construction of the original hospital building was completed in 1965 at a cost of $1,055,000, and that a "nursing wing" was built in 1968 at a cost of about $110,000.

Tauber testified that a foyer, corridor, and physical therapy unit were added to the hospital in 1974 at a cost of about $96,000, and that an intensive care unit was added in the

late 1970's at an approximate cost of $92,000.  He also stated that in 1979, a six-story office building was built on King Street (the Medical Office Building) at a cost of about $2,650,000.

Tauber testified that "the physicians" paid $1,600,000 of the construction costs of the Medical Office Building, but he did not identify more specifically who actually made these contributions.  He indicated that the remaining costs of that building were financed from the $1,400,000 "new mortgage" that was assumed by JMHC in 1978.  He also testified that another office building was constructed in 1982 on North Beauregard Street (the Beauregard Building) at an approximate cost of $722,000.

Tauber stated that as part of an effort to attract doctors to the Beauregard Building, JMHJV leased two-thirds of the building's office space to Irwin S. Freedman, one of the defendants, and his medical practice group.  Freedman's lease was for a term of ten years and provided that at its termination, Freedman could purchase the portion of the building he occupied for $1, conditioned on his group practice having admitted at least 90% of its patients to the hospital.  Eight and one-half years into the lease term, Freedman was permitted to purchase this two-thirds ownership share of the Beauregard Building for $1.

Tauber further testified that in 1983 a fourth-floor addition was built over the nursing wing of the hospital at a cost of approximately $927,000. Finally, he agreed that the hospital building would be a mere "white elephant" without the license to operate the hospital because the building was "a single-purpose building."

### III. CHANCELLOR'S DECISION

In a letter opinion dated July 13, 2000, the chancellor rejected the defendants' accounting. He observed that the methodology used by the defendants did not afford "an opportunity to calculate the receipts, disbursements, rents, and profits that actually accrued to [the defendants]." The chancellor also found, in relevant part:

> [The defendants] obtained interests in real property, were paid "dividends" in excess of their capital contributions, and finally obtained a settlement of a dispute with Inova directly arising out of hospital operations.

> Under accepted principles, [the defendants] cannot profit from the wrong doing found by the Court and must be called to account for the profit obtained. In addition, where [the defendants], trustees in dissolution, commingle their interests with those of the charity, they bear the burden of proving the separate nature of the assets. [The defendants] have not met that burden. Hence, they are accountable for all of the assets, rents, profits, and receipts they obtained.

The chancellor determined that JMHI's interest in the real property and improvements included a 70% interest in Hopkins

15

Parcels 1 and 2, a 100% interest in the Berman parcel, which he referred to as "Beauregard Street," and a 100% interest in the hospital improvements and the Beauregard Building. He concluded that the Commonwealth's accounting established that the defendants received net revenue through June 30, 1999 in the amount of $26,372,438. The chancellor also determined from the Commonwealth's accounting that the anticipated revenue from the 1994 INOVA Agreement through October 1, 2005, including the $10 million payment, was $24,703,145. These figures resulted in total net and future revenue in the amount of $51,075,583.

The chancellor's ruling further provided, in relevant part:

> Under strict accounting rules, [the defendants] would be liable for the accrued revenues plus the present value of the future payments due from Inova. However, equitable principles require that a fairness test be applied to any award in this case.

> Since [the defendants] now hold valuable real estates as trustees in dissolution, and since the benefit to other charities will be substantial even if [the defendants] are not required to account dollar-for-dollar, and the purposes of this cause will be served, this Court finds that an award of Twenty Million Dollars ($20,000,000.00) in addition to the real property is fair and just under all of the circumstances.

The chancellor also stated that he would consider further argument whether the defendants were entitled to a credit for "costs of acquisition and improvements to the realty actually incurred."

16

On November 13, 2000, a hearing was held in which the defendants presented evidence that Leslie P. Gondor, M.D., one of the defendants, paid $150,000 in 1964 to purchase an interest in certain real property from JMHI. Gondor made this purported purchase in his own name by means of an "off-record" letter transaction. At the same hearing, the defendants argued, among other things, that they should be given a credit for the construction costs of the hospital building, the Medical Office Building, and the Beauregard Building.

In a letter opinion dated December 27, 2000, the chancellor denied the defendants' motion for acquisition and construction credits and their motion to release portions of the award to certain charities controlled by Tauber. The chancellor also denied the Commonwealth's motion for an award of attorneys' fees and costs.

On February 21, 2001, the chancellor entered a decree incorporating his previous letter opinions and awarding judgment in favor of the Commonwealth as trustee against the defendants "individually and as former directors and/or trustees and/or trustees in liquidation," and against JMHA, JMHJV, JCA, and Tauber as trustee and agent for JMHA and JMHJV. The chancellor further decreed "that all of the assets referenced and described herein are subject to [the] constructive trust," including the anticipated revenue from the 1994 INOVA Agreement.

17

The chancellor's decree directed that the assets subject to the constructive trust be distributed according to the doctrine of cy pres. In his decree, the chancellor also provided for interest on his award at the statutory rate of nine percent from July 13, 2000, the date the chancellor issued his opinion letter deciding the case in favor of the Commonwealth.

The chancellor later held a hearing to set the amount of an appeal bond. He ruled that under Code § 8.01-676.1(C), he was obligated to "require the posting of an appeal bond . . . with surety or an irrevocable letter of credit in an amount sufficient to pay [the] judgment."

The defendants appealed from the chancellor's holdings. The Commonwealth assigned cross-error to the amount of the judgment and the chancellor's refusal to award the Commonwealth its attorneys' fees and accounting costs.

### IV. ISSUES RESOLVED BY TAUBER I

The defendants raise several arguments that we resolved in Tauber I or are necessarily decided by our holdings in that appeal. We will set forth these issues below.

### Void Transactions and "Fairness"

The defendants argue that the chancellor erred in failing to hold that the purported sale in 1975 of JMHI's assets to JMHC, or in the alternative, the 1982 transactions with HGV, constituted acts of trustees in dissolution of JMHI to "wind-up"

18

the non-profit corporation.  The defendants also assert that the chancellor erred when he held that the purported sale in 1975 of JMHI's assets to JMHC was void, regardless of the fairness of the sale from the perspective of JMHI.  We disagree with the defendants' arguments.

In Tauber I, we concluded that the law and the evidence fully supported the chancellor's rulings that JMHI and JMHC did not "merge" in 1971.  Id. at 455, 499 S.E.2d at 844.  We also held that the transactions purportedly taken by the directors after the 1973 charter revocation were void.  We stated:

> Because the 1971 "transaction" never occurred, the 1973 revocation of JMHI's corporate charter converted its directors by operation of law to trustees in dissolution . . . .
>
> The charter revocation terminated JMHI's corporate existence and powers, and it could no longer function as a corporation. . . .  From that day forward, the defendants' actions purportedly taken as corporate officers, and not done to wind up or liquidate the business, were without effect because there was no corporation for which to act.  The corporate assets had automatically transferred to the directors as trustees.

Id., 499 S.E.2d at 844-45.

In addition, as stated above, we concluded that the "record clearly demonstrates that the directors of JMHI, now trustees in dissolution, have failed and refused to execute the trust."  Id. at 456, 499 S.E.2d at 845.  We held that the transactions at issue showed "an entire course of self-dealing by the directors

19

of the charity" that resulted in "the total obliteration of the non-profit corporation [JMHI]." Id. at 453-54, 499 S.E.2d at 844.

These holdings in Tauber I mandate our present conclusion that the purported sale in 1975 of JMHI's assets to JMHC, and the 1982 transactions with HGV, did not constitute acts of the defendants as trustees in dissolution to "wind-up" the corporate affairs of JMHI. This conclusion is amply supported by the record, which contains no indication that the transactions in 1975 and 1982 were entered into by the defendants as trustees in dissolution of JMHI, on behalf of the charity, rather than as directors of JMHC who profited from the transactions.

In Tauber I, we also rejected the defendants' contention that we should apply a "fairness" test to the 1971 failed "merger" between JMHI and JMHC. Id. at 455-56, 499 S.E.2d at 845. Our conclusion was based on our holding that the defendants were not entitled under any circumstances to property rights or other assets belonging to JMHI, either during or after the life span of the corporation. We stated that "[t]o hold otherwise would convert the public nature and purpose of the corporation into a vehicle for the personal pecuniary gain of the members." Id. at 455, 499 S.E.2d at 845 (quoting Hanshaw v. Day, 202 Va. 818, 824, 120 S.E.2d 460, 464 (1961)). This conclusion applies equally to the purported sale in 1975.

20

Moreover, a defense of "fairness" is inapplicable to the review of a void transaction such as the 1975 purported sale, because that transaction in effect never occurred.

### Assets in Dissolution of JMHI

The defendants argue that the chancellor erred in classifying the rents, profits, and other sums accruing to entities controlled by the defendants, including revenues from the leases with HGV and INOVA and proceeds from the 1994 INOVA Agreement, as assets in dissolution of JMHI subject to the constructive trust. However, as stated above, we concluded in Tauber I that after JMHI's charter revocation, its corporate assets were automatically transferred to the directors as trustees in dissolution of the charity. Id. at 455, 499 S.E.2d at 844-45. The evidence before the chancellor in the first proceeding, and Wilson's accounting testimony in the proceeding on remand, identified the leases with HGV and INOVA, and the proceeds of the 1994 INOVA Agreement, as assets of JMHI that were diverted by the defendants for their personal benefit to JMHJV.

We also find no merit in the defendants' argument that the chancellor erred in including in the constructive trust a parcel of land that JMHI purportedly had transferred to Gondor in the 1964 "off-record" transaction. The chancellor's holding is supported by Vella's testimony in the initial proceeding that

21

JMHI presently is the beneficial owner of certain real property that includes the interest allegedly transferred to Gondor. Therefore, we conclude that the chancellor properly placed the above assets and property in the constructive trust.

### "Sale" of Beauregard Building

The defendants contend that the chancellor erred when he held that the Beauregard Building was an asset in dissolution of JMHI. They contend that this building was sold to Freedman, one of JMHI's trustees in dissolution, and other bona fide purchasers for value who lacked notice of "any adverse claim" regarding the property. The defendants further contend that the imposition of a constructive trust on this property violated the Due Process Clause of the United States Constitution. We disagree with the defendants' arguments.

In Tauber I, we held that the trustees in dissolution of JMHI were not entitled to any of the charity's assets after the dissolution of the charity. Id. at 455, 499 S.E.2d at 845. However, Freedman purportedly purchased his two-thirds interest in the Beauregard Building for $1 in 1992, during his tenure as a trustee in dissolution of JMHI. He entered into this purported transaction about 19 years after JMHI's charter revocation.

A purchaser of real property is bound by both constructive and actual notice and "has no right to shut his eyes or his ears

22

to the inlet of information, and then say he is a bona fide purchaser [for value] without notice."  Richmond v. Hall, 251 Va. 151, 157, 466 S.E.2d 103, 106 (1996) (quoting Burwell v. Fauber, 62 Va. (21 Gratt.) 446, 463 (1871)).  Thus, we conclude that Freedman was not a bona fide purchaser for value without notice because at the time of his alleged purchase, he had actual notice that the charity had been dissolved and constructive notice that the Beauregard Building was one of the charity's assets.[1]

## "Safe Harbor" Defenses

The defendants assert that the chancellor "failed to apply the law in effect at the time [he] rendered [his] decision," and that his "failure to apply Maryland law violated the Full Faith and Credit, Due Process, and Commerce Clauses of the United States Constitution."  In support of these arguments, the defendants note that Maryland law provides a "safe harbor" for corporate directors who act in good faith in discharging their corporate duties.[2]  The defendants also argue that the chancellor should have conducted a hearing concerning whether they took their actions as corporate officers in good faith.

---

[1] We do not address the status of the other purported purchasers of the Beauregard Building because they are not parties to this suit.

[2] See Md. Code Ann., Corps. & Ass'ns § 2-405.1 (2001).

These arguments are completely precluded by our holding in Tauber I that the defendants were trustees in dissolution of JMHI, rather than corporate directors, following JMHI's charter revocation in 1973. Id. at 455, 499 S.E.2d at 844. Therefore, any defenses of good faith in the exercise of business judgment that may be asserted by corporate directors of a non-profit corporation are inapposite here. See Code § 13.1-870; Lake Monticello Owners' Ass'n v. Lake, 250 Va. 565, 571, 463 S.E.2d 652, 656 (1995). See also Md. Code Ann., Corps. & Ass'ns § 2-405.1 (2001); Werbowsky v. Collomb, 766 A.2d 123, 138 (Md. 2001).

## Doctrine of Cy Pres

The defendants assign error to the chancellor's decision to apply the Virginia law of cy pres rather than Maryland law governing the distribution of assets of a Maryland non-profit corporation. The common law doctrine of cy pres permits a court of equity to administer a charitable trust to conform as closely as possible to the purpose for which the trust was created or, if that purpose cannot be achieved, for some other charitable purpose.[3] See Baliles v. Miller, 231 Va. 48, 56 n.7, 340 S.E.2d 805, 810 n.7 (1986); Campbell v. Board of Trustees, 220 Va. 516, 524, 260 S.E.2d 204, 209 (1979).

24

In Tauber I, we held that the chancellor properly imposed a constructive trust so that the assets of JMHI can be distributed in accordance with appropriate charitable purposes.  We stated that

> the [chancellor] properly exercised [his] authority to insure that these assets, now held by the defendants as trustees in liquidation, are distributed in accord with the charitable purposes to which they should have been devoted.  This power to liquidate the assets and business of a nonstock corporation may be exercised over the property within the court's jurisdiction "of a foreign corporation that has ceased to exist."  Code § 13.1-909(B).

Id. at 456, 499 S.E.2d at 845.  Based on this holding in Tauber I, we conclude that the chancellor properly invoked the doctrine of cy pres in providing for the future distribution of JMHI's assets.

## Individual Liability

The defendants argue that the chancellor erred in holding them individually liable for the amount of the assets diverted from the charity.  The defendants also assert that they were entitled to notice and a hearing on the issue of individual liability under Virginia Code § 13.1-870, Md. Code Ann., Corps. & Ass'ns § 2-405 (2001), and the Due Process Clause of the United States Constitution.

---

[3] We note that Code § 55-31, the "cy pres" statute, is inapplicable here because its provisions are confined to express trusts.

25

These arguments, however, are precluded by our decision in Tauber I. In the amended bill of complaint in the original proceedings, the Commonwealth asserted, among other things, that the defendants were liable for the acts complained of "each individually and as a former director of [JMHI] . . . and/or as partners in Jefferson Memorial Hospital Associates, or [JMHJV], and/or directors or shareholders of [JMHC] (a Delaware Corporation now known as 'Jefferson Corporation of Alexandria')." Id. at 449, 499 S.E.2d at 841.

The chancellor held that the Commonwealth was entitled to the relief requested in its amended bill of complaint, and we upheld the chancellor's determination, without exception. Id. at 450, 456, 499 S.E.2d at 842, 845. This disposition in Tauber I resolved the issue of the defendants' individual liability, and their liability for their actions on behalf of JMHI, JMHC, JCA, JMHA, and JMHJV.

## V. ISSUES NOT RESOLVED BY TAUBER I

We turn now to consider the defendants' assignments of error that are not precluded by our decision in Tauber I. After that discussion, we will examine the Commonwealth's assignments of cross-error.

### Burden of Proof on Remand

The defendants argue that the Commonwealth had the burden of tracing JMHI's assets into an identifiable account or

26

property. They assert that as a claimant seeking recovery of assets that may have been commingled with other assets, the Commonwealth must identify the portion of the commingled property to which it is entitled. In response, the Commonwealth contends that when trustees have commingled personal assets with those belonging to the trust, the entire commingled fund is subject to the constructive trust unless the trustees can distinguish the funds to which they personally are entitled.

In stating the burden of proof applicable to these proceedings, we first observe that a constructive trust arises by operation of law to prevent what otherwise would result in a fraud. See Crestar Bank v. Williams, 250 Va. 198, 204, 462 S.E.2d 333, 335 (1995); Leonard v. Counts, 221 Va. 582, 589, 272 S.E.2d 190, 195 (1980). The chancellor's imposition of a constructive trust, which we approved in Tauber I, reflected his determination that the defendants had wrongfully diverted the assets of JMHI into other entities and business opportunities for their personal benefit.

On remand, the chancellor was required to fix the amount of JMHI's assets held by the defendants as trustees in dissolution of the charity. As the successful proponent of the constructive trust, the Commonwealth bore the initial burden on remand of tracing JMHI's assets and establishing the amount of its intangible assets. See Crestar Bank, 250 Va. at 204, 462 S.E.2d

27

at 335-36; Watts v. Newbury, 107 Va. 233, 240, 57 S.E. 657, 659 (1907).  However, to the extent that the defendants commingled their own property with JMHI's assets and sought recovery of such property, they had the burden of proving how much of the commingled funds they owned personally.  See Brown v. Coleman, 566 A.2d 1091, 1097 n.7 (Md. 1989); Bass v. Smith, 56 A.2d 800, 805 (Md. 1948); MacBryde v. Burnett, 132 F.2d 898, 900 (4th Cir. 1942); V Austin W. Scott & William F. Fratcher, The Law of Trusts § 515, at 609 (4th ed. 1989).  The defendants bore this evidentiary burden because when trustees conduct their affairs in a manner that prevents a precise accounting of trust assets, the trustees, rather than the trust, must suffer the consequences.  Am. Nat'l Bank v. Ames, 169 Va. 711, 750, 194 S.E. 784, 798 (1938); see Royall v. Peters, 180 Va. 178, 189, 21 S.E.2d 782, 787 (1942); First Nat'l Bank v. Commercial Bank & Trust Co., 163 Va. 162, 175, 175 S.E. 775, 779 (1934).

## Evidence Tracing JMHI's Assets

The defendants argue that the Commonwealth's accounting, on which the chancellor relied, was "flawed" and did not account for the "separate income" attributable to JMHC and JMHJV.  They also contend that JMHI did not have an ownership interest in the hospital or in its underlying land, and that the Commonwealth failed to trace JMHI's assets into the Beauregard Building, the HGV lease, and the INOVA transactions.  The defendants also

28

assert that the chancellor erred in rejecting their accounting, which they claim properly identified their separate personal assets.

In response, the Commonwealth argues that its evidence was sufficient to meet its burden of tracing JMHI's assets and of establishing the amount of its intangible assets.  We agree with the Commonwealth.

We consider the parties' arguments in the context of the chancellor's March 1997 order, which provided the framework for his determination of the amount of JMHI's assets.  As stated above, in that order the chancellor directed the defendants to submit "a full and complete accounting of all [JMHI's] assets and liabilities that . . . shall disclose all rents, issues, profits, accretions, and benefits, tangible and intangible, which have accrued therefrom."

In response to the chancellor's directive, the defendants submitted Cobb's accounting, which did not satisfy these requirements identified by the chancellor.  Instead, Cobb attempted to place a value on the charity through the use of hypothetical dissolution dates of 1975, 1982, 1992, and 2005. This methodology was a complete departure from that used by the Commonwealth's accountant, Wilson, who structured his accounting of JMHI's assets in accordance with the requirements stated in the chancellor's decree.

29

The chancellor's decision to reject Cobb's approach was supported by Wilson's testimony. Wilson explained that Cobb's approach was not a fiduciary accounting because Cobb did not attempt to determine what actually had occurred with regard to JMHI's assets and liabilities, but merely made estimations regarding JMHI's value on certain dates. Wilson indicated that the use of this approach was unsound because JMHI was never liquidated and, thus, any valuation information was merely hypothetical in nature. Based on this evidence, we conclude that the chancellor did not err in rejecting Cobb's valuation approach.

We also hold that the chancellor did not err in accepting the Commonwealth's evidence tracing JMHI's assets. First, Vella's testimony supported the chancellor's award of the real property, including the improvements, to the Commonwealth. Vella, an expert in real property and title issues, stated that JMHI owned the Berman Parcel, which was also known as the Beauregard Street Parcel. In addition, she stated that JMHI owned a 65% undivided interest in the entire portion of land comprising Hopkins Parcels 1 and 2, as well as a parcel of land that overlapped Hopkins Parcels 1 and 2. Vella also testified that JMHI owned the beneficial interest in the hospital building and also owned all structures and improvements built on Hopkins Parcels 1 and 2 and the Berman Parcel. These buildings included

the Beauregard Building, which was built partly on the Berman Parcel.

Second, Wilson's accounting testimony and supporting documentary evidence satisfied the Commonwealth's burden of tracing JMHI's other assets.  This evidence established that the primary value of the hospital derived from its operating license, which Wilson described as the "engine" that propelled the charity.  Wilson testified that because the hospital operated as a "going concern" until the time of the 1994 INOVA Agreement, the hospital license generated many financial opportunities that Wilson identified as belonging to JMHI, rather than to the defendants and their "for-profit" entities. These opportunities included the 1982 HGV lease and the INOVA transactions.

As stated above, Wilson determined that the value of JMHI's assets, excluding the real property and improvements, subject to the constructive trust totaled $26,372,438 as of June 30, 1999. He also concluded that an additional $24,703,145 will accrue to the benefit of the constructive trust under the terms of the 1994 INOVA Agreement.  Thus, we conclude that the evidence accepted by the chancellor adequately traced JMHI's assets, including the amount of its intangible assets.

### Acquisition and Construction Costs

The defendants argue that the chancellor erred in denying them credit for acquisition and construction costs relating to JMHI's assets that were subject to the constructive trust. They assert that they are entitled to a credit for "sums advanced in transactions declared void by the Commonwealth," and for the purchase price paid by Gondor for the above-described interest in property he purportedly purchased in his own name. We disagree with the defendants' arguments.

In the chancellor's July 13, 2000 letter opinion awarding judgment in favor of the Commonwealth, he directed the parties to schedule a hearing for the determination, among other things, of any credit due to the defendants for acquisition costs. The chancellor also stated that he would consider whether the defendants were entitled to a credit for "improvements to the realty actually incurred." At a hearing in November 2000, the defendants did not present any testimony but argued from the evidence already presented that the costs expended in acquiring the properties and in building the improvements should be credited to them.

After considering the parties' arguments, the chancellor denied the defendants' request for such credits. We hold that the record supports the chancellor's decision. The defendants did not meet their burden of proving that their personal funds, rather than funds received from the operation of the hospital or

32

from some other source, were spent to acquire property in JMHI's name or to construct improvements on property already owned by JMHI.

We also observe that the balance of the record fails to support the defendants' request for cost credits. Most notably, as stated above, the evidence showed that they diverted about $51 million of the charity's present and future assets into the "for-profit" entities in which they participated. They also received funds from the redemption of shares initially conveyed to them by JMHC in 1971 at the time of the failed "merger." The record shows that the defendants obtained at least $508,000 in these redemption transactions. Finally, the defendants' accountant, Cobb, acknowledged that the defendants made only one capital contribution to JMHI, which was repaid to them within two years.

## Donations to Other Charities

We also find no merit in the defendants' argument that the chancellor improperly included in his award assets purportedly transferred by JMHJV to two charities, which are controlled by Tauber as trustee. These alleged donations were made after JMHI's dissolution, and the defendants failed to prove that the "donations" were made from their own personal funds, rather than from the assets of JMHI that were subject to the constructive trust.

33

## Prejudgment Interest

The defendants argue that the chancellor erred in calculating the award of interest from the date he issued his July 13, 2000 letter opinion rather than from February 21, 2001, the date of his decree awarding the $20 million judgment to the Commonwealth. Citing Code § 8.01-382, the defendants assert that interest may be awarded only from the date of entry of a judgment or decree. We disagree with the defendants' argument.

We consider the language of Code § 8.01-382 in accordance with its plain meaning. See Vaughn, Inc. v. Beck, 262 Va. 673, 677, 554 S.E.2d 88, 90 (2001); Cummings v. Fulghum, 261 Va. 73, 77, 540 S.E.2d 494, 496 (2001). This statute provides, in relevant part, that when an action or a suit is heard by the court without a jury, the court "may provide for interest on any principal sum awarded, or any part thereof, and fix the period at which the interest shall commence."

The plain language of Code § 8.01-382 gave the chancellor discretionary authority to determine whether the Commonwealth was entitled to prejudgment interest and to fix the date from which such interest was due. The chancellor's decision awarding interest on the monetary portion of the judgment from July 13, 2000 effectively provided prejudgment interest at the statutory rate between July 13, 2000 and the date of the chancellor's decree, February 21, 2001. We conclude that based on the

34

extended duration of this suit, and the overwhelming evidence in the record against the defendants, the chancellor's decision to award interest from July 13, 2000 was not an abuse of his discretionary authority under the statute.

## Appeal Bond

Finally, the defendants argue that the chancellor erred in ruling that Code § 8.01-676.1(C) provides the sole method by which a court may suspend execution of a decree pending appeal. The defendants assert that this statute does not limit the chancellor's "inherent authority" to set a bond in an amount less than the judgment to stay execution of a decree.  We disagree with the defendants' arguments.

The plain language of the statute governs our analysis. See Vaughn, 262 Va. at 677, 554 S.E.2d at 90; Cummings, 261 Va. at 77, 540 S.E.2d at 496.  In relevant part, Code § 8.01-676.1(C) provides that an appealing party who requests a suspension of execution of a judgment during an appeal "shall . . . file an appeal bond or irrevocable letter of credit conditioned upon the performance or satisfaction of the judgment and payment of all damages incurred in consequence of such suspension, and . . . execution shall be suspended upon the filing of such security and the timely prosecution of such appeal."

This statutory language does not give the trial court discretion to set an appeal bond in an amount less than the judgment. The purpose of the statute is to secure payment of the full judgment amount and all damages incurred as a result of the suspension of execution of the court's decree. A lesser amount would undermine the security of the judgment to which a prevailing party is entitled in the event that an appellant does not succeed on appeal. Thus, we hold that the chancellor did not err in requiring the defendants to post an appeal bond in conformance with the mandatory terms of the statute.

## Amount of Judgment

Asserting cross-error, the Commonwealth contends that the chancellor erred in failing to award the Commonwealth the full amount of diverted assets identified by Wilson in the amount of about $51 million. The Commonwealth contends that it is entitled to that amount, rather than the $20 million amount awarded by the chancellor, based on the evidence presented and the defendants' failure to meet their burden of proving any separate sums to which they were entitled. Thus, the Commonwealth argues that the chancellor improperly reduced the award from the total sum that he determined the defendants would have been liable to pay under "strict accounting rules." In response, the defendants ask us to reject the Commonwealth's

argument, asserting that the chancellor failed to make any findings supporting such an award to the Commonwealth.

In resolving this issue, we first observe that the chancellor accepted the Commonwealth's accounting but cited general principles of "equity and fairness" in support of his decision reducing the amount of the award. He also noted the fact that JMHI's property included valuable real estate, and that "the benefit to other charities will be substantial even if [the defendants] are not required to account dollar-for-dollar, and the purposes of this cause will be served." The chancellor entered judgment in the reduced amount after finding that the Commonwealth had proved that the defendants diverted from JMHI the sum of $26,372,438 in present net revenues, and an additional sum of $24,703,145 in future net revenues, for a total lost revenue amount of $51,075,583.

We conclude that because the assets at issue were funds belonging to a charity, the chancellor erred in reducing the amount of the award from the sums established by the evidence he had approved. In effect, the chancellor's award permitted the defaulting trustees of JMHI to retain significant assets of the charity that belong to the public. This result was erroneous. The defendants, as fiduciaries, were precluded from retaining any of these assets because they "acquired no property rights in, nor were they equitably entitled to such assets, either

37

during the lifetime of the [non-profit] corporation or upon dissolution." Tauber I, 255 Va. at 455, 499 S.E.2d at 845 (quoting Hanshaw v. Day, 202 Va. 818, 824, 120 S.E.2d 460, 464 (1961)).

### Attorneys' Fees and Costs

The Commonwealth also assigns cross-error to the chancellor's decision denying the Commonwealth attorneys' fees and costs, asserting that the fees were incurred because the defendants failed to execute their duties as trustees in dissolution and evaded their accounting obligations under the chancellor's March 1997 decree. The Commonwealth contends that an award of attorneys' fees would have been appropriate under our decision in Prospect Development Company v. Bershader, 258 Va. 75, 515 S.E.2d 291 (1999), and that an award of costs should have been made under Code § 26-23.

Upon consideration of these arguments, we conclude that the chancellor did not abuse his discretion in failing to award attorneys' fees and costs. In Bershader, a fraud suit, we approved a chancellor's award of attorneys' fees when the evidence showed that the defendants engaged in "callous, deliberate, deceitful acts," which caused the plaintiffs to incur over $150,000 in attorneys' fees. Id. at 92, 515 S.E.2d at 301. We acknowledged the discretionary nature of the chancellor's authority and held that he did not abuse that

discretion based on the amount of effort required to protect the defrauded parties' rights.  Id. at 92-93, 515 S.E.2d at 301.

Unlike Bershader, this case does not involve a review of an award of attorneys' fees, but concerns the chancellor's failure to award such fees.  Thus, the Commonwealth effectively asks us to conclude that under the facts of this case, the chancellor was required as a matter of law to award attorneys' fees to the Commonwealth.  We decline to restrict the chancellor's discretion in this manner.  Although the defendants engaged in a longstanding course of self-dealing at the expense of JMHI, which would have supported an award of attorneys' fees under the evidence presented, we cannot say that the chancellor lacked the discretion to deny attorneys' fees after considering the other relief awarded.

We also disagree with the Commonwealth's contention that the chancellor erred in failing to award the Commonwealth its costs under Code § 26-23 for the preparation of its accounting. Code § 26-23 provides:

> The costs of all proceedings against fiduciaries failing, without good cause, to make the returns and exhibits required, shall be paid by them personally, and they shall receive no allowance for the same in the settlement of their accounts.

This statute is limited to an award of costs related to proceedings instituted against fiduciaries who fail to make returns required by statute in performance of their duties in a

chancery case.  Thus, this provision has no application to the present case and did not provide the trial court the authority to award the Commonwealth its expert witness fees for its accounting.

Finally, we have considered, and reject, the other arguments presented by the defendants in this appeal.

                              VI. CONCLUSION

For these reasons, we will reverse the monetary portion of the chancellor's award and enter final judgment for the Commonwealth as trustee in the amount of $26,372,438, with interest from July 13, 2000 at the judgment rate fixed by Code § 6.1-330.54.  We will affirm the chancellor's judgment in all other respects, including the real estate interests awarded to the Commonwealth as trustee.

We will remand the case to the chancellor for execution on the appeal bond, collection of the judgment, and for distribution of JMHI's current assets in accord, as nearly as possible, with the charitable purposes to which they should have been devoted.  The constructive trust imposed by the chancellor on the proceeds due from the 1994 INOVA Agreement will continue for the duration of that Agreement for receipt of future net revenues due after June 30, 1999, in the amount of $24,703,145. Such sums will be paid when due into the Circuit Court for the City of Alexandria for distribution by the chancellor in

accordance, as nearly as possible, with the charitable purposes to which they should have been devoted.

<u>Affirmed in part and final judgment, reversed in part, modified, and final judgment as modified, and remanded.</u>