Staples, J.
The first question is as to the misjoinder of parties. It is contended by the counsel for the appellee, that two or more of the plaintiffs, having been paid their respective legacies, have no interest in the suit, and are therefore improperly joined as plaintiffs; and this objection may be taken by demurrer or plea, or even at the hearing. Admitting that the point would be fatal if taken in due time, the questidn arises whether it can be made for the first time in this court.
In this country, it is believed, the rule is well settled, that in cases of misjoinder of parties as plaintiffs in equity, the objection must be made by demurrer if the defect is apparent on the face of the bill, or by plea or answer, if the defect does not so appear; and unless so made, the objection will not avail at the hearing, if a decree can be rendered without prejudice to the rights of parties. If the misjoinder cannot materially affect the propriety of the decree, the court will not regard it at the hearing, if the objection has not been made in the pleadings. Livingston v. Woodworth, 15 How. U. S. R. 546, 557; Trustees of Watertown v. Cowen, 4 Paige E. 510; Harder v. Harder, 2. *158 Sanf. Ch. R. 17; Newhouse v. Miles, 2 Alab. R., N. S., 460; Ellicott v. Ellicott, 2 Mary. Ch. R. 468; Bunce v. Gallagher, 5 Blatch. R. 490; Story Ch. Plead., see. 188, 544.
There are several well considered English cases . which hold that notwithstanding a misjoinder of parties plaintiff, the court permits a' decree at the hearing when it appears that justice can be done to all the parties. In Rafferty v. King, 15 Eng. Ch. R. 604, 620, Lord Langdale, in adverting to the objection that one of the plaintiffs had no interest in the suit, said: “I think it' is now too late. If the objection had been stated in the answer, the plaintiffs might have obtained leave to amend their bill and make John Rafferty a defendant instead of a co-plaintiff. In such a case as this, when the objection is reserved to the last moment, and even till after argument on the merits, I ought not to allow it to prevail.” See also the eases cited in a note to that case, and Lambert v. Hutchinson, 13 Beavan R. 277; Dickenson v. Davis, 2 Leigh 401.
In the case before us the plaintiffs alleged to be improperly joined were infants at the time their legacies were paid, and nearly all of them so continued when this suit was brought. It is highly probable the other parties knew nothing of these payments. The defendant of course knew all about them. It was therefore the more incumbent upon him to make the objection in some form in the court below, and at an early stage ■of the proceedings. Had he done so, the plaintiffs might have dismissed their suit, and commenced a new one in the name of proper parties, or they might have amended their bill by striking out the names of those improperly joined, and making them defendants, if so advised.
This, however, is unnecessary in the present state *159 ■of the case, as a decree maybe entered in favor of 7 v such of the plaintiffs as are entitled to recover, and the bill be dismissed as to the others with or without , • •costs.
The main ground of controversy is in respect to the sum of $2,305.24, received by the executor and never accounted for by him. This sum is part of the assets ■of the estate with which the executor charged himself in his settlement made in 1859. Being thus in possession of the fund, the burden is upon him to establish the ground of his exemption from liability. His defence is that he could .not safely distribute all the •assets, because there were unsettled claims against the ■estate for along period, and when at last these were adjusted, the condition of the country and of the legatees precluded a settlement, until finally the fund perished by the results of the war. It appears that the last claim ever asserted against the estate was settled in 1861.
The executor in his answer states that a Mr. Wilson informed him that he knew of three or four bonds for which the estate was bound, and that he (Wilson) would procure a statement of them and send it to the defendant. Mr. Wilson did not say who held the bonds, nor did he name the amount. The -executor does , not appear to have made any enquiry on the subject. This was the first and the last ever heard of the bonds. Ho statement was ever furnished •and no claimant ever appeared.
This is the only excuse given by the executor for his delay in settling up the estate, and for his failing to pay for so many years to the legatees, funds to which they were justly entitled. The executor had a plain course before him, either to require refunding bonds, •or to lend out the money upon good security, bearing *160 interest, or to invest it under the direction of a court 7 of equity. There is no foundation for the assertion that the legatees were so much scattered after the war commenced, the executor could not pay them. It is in Pr0°f that nearly all of them were in reach of the executor as late as the year 1862, and some of them were so down to the close of the war.
In order fully to understand the ground upon which the executor bases his defence, it may be better to give •his statement in his own words, made in his answer. It is as follows: “ The money now sought to be recovered of him by the plaintiffs was then, to wit, on the' 13th March 1861, in the Farmers and Exchange Bank of Ya. at Richmond, in the very same place where your respondent kept his own money, and where he had at that time to his credit, more money than was due his testator’s estate, besides at least three thous- and dollars in his house, and. continued from time to time to make deposits until he had to his credit an amount exceeding forty thousand dollars.”
It will be seen that the defendant does not state the year in which the deposit was made; nor does he say how much of the trust money was deposited in each bank. All that is said is, that the funds were in those banks on the 13th March 1861. The only evidence offered in support of this statement is the defendant’s account with the Farmers and Exchange Banks respectively. These accounts, however, show only his individual transactions with those banks: they do not show any deposit of trust funds. There is not in •either' of them an item or figure from which it can by possibility be inferred that the money to the defendant’s credit in those banks was in any manner connected with the funds of the estate. The account with the Farmers Bank commences in 1848, and closes in *161 March 1864. The various balances to the credit of the defendant, from time to time, were exhausted by checks, and these were succeeded by other so that although the defendant was perhaps at no time without funds on deposit down to March 1864, vet the character of that fund had wholly changed by the last mentioned period. The money to his credit in March 1864, or at the close of the war, was not the money, nor the same kind of money to his credit in March 1861. The money which perished by the results of the war was Confederate currency, belonging to the defendant, collected during the war, and was not the money collected by him in 1869 for the estate, nor even a substitute for that money. But this is not all. The account shows a balance of $19,753.89 to the credit of the defendant in March 1864. What has become of that balance ? There is nothing to show, and wé are given no information beyond what is furnished by the account. The war did not close till a year afterwards. In the meantime the defendant was a refugee, and his section overrun by the enemy. He must necessarily have used the greater portion of the fund to supply his individual wants and necessities. At all events we are entirely in the dark as to the state of the account at the termination of the war in April 1865.
The account with the Exchange Bank is liable to the same criticism in every respect. This account shows a balance of $1,821.98 to the credit of the defendant on the 1st March 1862; but whether it is March 1862, or 1863, or 1864, does not distinctly appear. The reference is probably to March 1862, when the account closes. What became of this balance we are not told. Whether it was designed or not, we are left to infer that the fund remained in bank three *162 years without use, and was finally lost by the result of the war.'
But it may be conceded that the defendant deposited the money in bank, that he never withdrew it, but it rained there until gradually converted into Confederate currency, and finally perished on his hands. All this may be conceded, and yet it does not materially help his case. As has been seen, the defendant kept no separate account of the trust funds, but mingled them with his own money, checking indiscriminately upon the two. All the cases agree that a fiduciary who makes investments, or deposits trust money in his own name, without designating in some way, or describing it as the property of the trust, will be held liable for any loss that may accrue. One of the reasons for this rule is, that the fiduciary would otherwise be able to throw upon the cestui que trust the hazards of his own business, by designating the fund upon which the loss has fallen as his (the 'cestui que trust’s), whether it was or was not so in reality. Yol. 2, part 2d, page 1805, Leading Oases in Equity (ed. 1877). The cases of Harman v. Davis and Pidgeon v. Williams, 21 Gratt. pages 194, 251, do not affirm a different doctrine. In the first named case the money collected was exclusively Confederate currency, collected with the approbation of all the parties, and the larger part of it duly distributed. The balance on hand the court directed its commissioner to hold until it was called for. The commissioner deposited it in bank in his own name. He had no other funds in bank, and no part of the deposit was ever used or withdrawn by him, except to pay the parties upon orders of the court. The controversy then pending not having been settled during the war, the balance of the fund in bank of course perished with the close of the struggle. This court, *163 while recognizing the principle of law in respect to fiduciaries already stated, was of opinion it had no application to that case. The commissioner was eeted to hold the fund subject to the orders of court; and no safer place could be selected than the bank. ' It was lost, not by the failure of the bank, but by the destruction of that which was the subject of the deposit.
And so in Pidgeon v. Williams, the money deposited was Confederate money—it was not placed to the individual account of the attorney, but to his collection account—thus showing a purpose to keep the client’s money separate from his own. These and other facts were deemed sufficient to prevent the application of the general rule already adverted to; but the whole court was of opinion that if the attorney had mingled his client’s money with his own, or deposited it in ■bank upon his private account as his own money, this would be evidence of an appropriation to his own use, and his relation to his client would henceforth be that of debtor and creditor, and not that of bailor and bailee.
These cases, it is thus seen, afford no sort of authority to the executor in the present case. He collected the assets of the estate in a sound currency, deposited it in bank to his own private account, using the fund to advance his credit, and appropriating it to his individual purposes, as his convenience or his necessities required. It is very true that he deposited other funds from time to time, in place of what was withdrawn; but this was only done because it suited him, as it suited others, to use the banks as depositories for his private funds. If the money to the credit of the defendant proved as valuable as gold, these legatees could not have claimed any part of it, or derived any *164 advantage from it. Stripped of all its factitious surroundings, the transaction presents the simple case of' a fiduciary or his representative seeking to throw upon the legatees the loss of his own Confederate currency. It is not intended to impute to this executor any dishonest purpose. He is represented as a gentleman of' high social position, and of undoubted integrity; but we are asked to accord to him, upon his own unsupported answer, a measure of indulgence never allowed any fiduciary. Ho case decided by this court in reference to Confederate transactions, has gone to the extent of sustaining the defence made here.
My opinion is to reverse the decree of the circuit court, and to enter a decree for the balance reported by the commissioner.
In respect to the claim for compensation on account of professional services rendered the estate by the executor, the evidence does not show any such service of this sort, beyond the ordinary duties of an executor, as entitles the defendant to compensation. It is therefore unnecessary to decide the question raised by the learned counsel for the defendant, as to the right of an executor to charge the estate for services-rendered in the capacity of counsel.
Moncure, P., and Burks, J., concurred in the opinion of .Staples, J.
Anderson, J., dissented.
Decree reversed.