PRESENT:  All the Justices

JON C. CARLSON, ET AL.

                                        OPINION BY
v.   Record No. 092076          JUSTICE WILLIAM C. MIMS
                                       January 13, 2011
VALERIE A. WELLS, ET AL.

        FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
                      Frederick B. Lowe, Judge

     In this appeal, we consider the duty of care owed by the

custodian of a Virginia Uniform Transfers to Minors Act

("UTMA") account and whether the appellants in this case

breached that duty.  We also review the tracing of commingled

funds and the award of attorneys' fees.

        I.    BACKGROUND AND MATERIAL PROCEEDINGS BELOW

     Jon C. Carlson ("Jon") and Valerie A. Wells ("Wells") were

married from 1984 to 2000.  They had three children during the

marriage:  Eric Carlson ("Eric"), Scott Carlson ("Scott"), and

Ariel Carlson ("Ariel") (collectively, "the Children").  During

the marriage, Jon and Wells established several accounts for

the Children under the UTMA, Code §§ 31-37 to –59.[1]  Jon was the

custodian of the majority of these accounts but Jon's brother,

_____

     [1] Specifically, Eric, Scott, and Ariel each had a Vanguard
money market account (account numbers ending in 826, 839, and
128, respectively), a Vanguard brokerage account, and Vanguard
Health Care and Primecap mutual fund accounts.  Eric and Scott
each had an additional Vanguard money market account (account
numbers ending in 595 and 980, respectively).  Each child also
had an American Century account.

James Carlson ("James"),[2] was the custodian of the money market accounts with account numbers ending in 595 and 980, which held the bulk of the UTMA funds for Eric and Scott.

In December 2003, while Eric was in high school and deciding where to apply to college, he and Jon discussed the financial resources available to fund Eric's education. Jon told Eric that the money that had been saved for the Children's education might not be available. Eric then accessed the UTMA accounts online and discovered that the funds had been withdrawn. He asked the Carlsons and Jon's attorney to see the financial records for the UTMA accounts but they did not respond.

Wells, together with Eric in his own right and Scott and Ariel through Wells as their next friend,[3] subsequently filed a complaint in the circuit court seeking removal of the Carlsons as custodians of the UTMA accounts, a full accounting, compensatory damages, punitive damages, attorneys' fees, and costs. In May 2004, Jon paid the Plaintiffs $190,571.40, which he contended represented the balance of the UTMA funds in the Carlsons' custody, and effectively resigned as custodian. In March 2005, Jon also provided what he contended was a full accounting of the UTMA funds.

_____

[2] We refer to Jon and James collectively as "the Carlsons."
[3] We refer to these parties collectively as "the Plaintiffs."

Jon's accounting showed that he had closed most of the Children's individual accounts in 2002 and transferred their balances to a single Bank of America savings account opened in his and all of the Children's names (the "BOA 866 account").[4] Jon had made several withdrawals from the BOA 866 account, ostensibly to reimburse himself for expenses he incurred on the Children's behalf and to make further investments for them. These investments included transferring funds to his personal Vanguard Health Care mutual fund and Fidelity Investments accounts. He also used his own money and $40,000 of the Children's UTMA funds to purchase US Airways stock shortly before the company sought bankruptcy protection in 2002, thereby rendering the stock worthless.

In April 2005, the court referred proceedings on the Plaintiffs' complaint to a commissioner in chancery. In April 2009, following six days of testimony taken in the spring of 2006, the commissioner reported his findings. In his report, the Commissioner found that the Plaintiffs had received a full accounting in March 2005; that, despite having commingled UTMA funds with his own property, Jon had breached his custodial duties only by failing to permit the Plaintiffs to make an

---

[4] The Children's American Century accounts were not closed and the funds in them were undisturbed at the time of the accounting. Money market accounts 595 and 980 were not closed but held only nominal balances at the time of the accounting.

inspection of the UTMA records when they sought to do so in 2003 and 2004; that James had not breached his custodial duties; that the Carlsons had not breached any common law fiduciary duty; that, prior to the hearings, the Carlsons had resigned as custodians, rendering their removal moot; that the Children were entitled to $3600 in compensatory damages; that the Children were not entitled to punitive damages; that the Plaintiffs were entitled to recover attorneys' fees incurred only through the date they received the full accounting in March 2005; and that the Plaintiffs bore the costs of the commissioner's hearing.

Jon filed exceptions to the commissioner's report challenging the award of $3600 in compensatory damages, the award of any attorneys' fees to the Plaintiffs, and the failure to award him attorneys' fees. The Plaintiffs filed exceptions to the report challenging the failure to find that the UTMA funds did not significantly diminish while in the Carlsons' custody, the failure to find that Jon breached his custodial duty to maintain records, the failure to find that James breached his custodial duties, the failure to find any breach of common law fiduciary duty, the finding of only $3600 in compensatory damages, the failure to find punitive damages, the failure to award them attorneys' fees incurred after March

4

2005, and the failure to award them the costs of the commissioner's hearing.

Reviewing the commissioner's report, the evidence, and the exceptions filed by the parties, the circuit court found that the Carlsons had breached their duties to the Children. Specifically, the court found that James had abdicated his custodial responsibility; that Jon had violated his custodial duties by failing to keep proper records, resulting in his inability to account for $19,910.88 in UTMA funds; and that Jon had violated the applicable standard of care by speculating in US Airways stock when he knew the company was on the verge of bankruptcy, resulting in a loss of $40,000 in UTMA funds. Accordingly, the court awarded the Children $31,767.36 in damages from James and $28,143.52 in damages from Jon, in proportion to the amounts in their custody, as well as awarding the Plaintiffs $20,000 in attorneys' fees, $10,500 in commissioner's fees, and $2,602.03 in costs from the Carlsons jointly and severally. We awarded the Carlsons this appeal.

## II. ANALYSIS

"When a [circuit court] has disapproved a commissioner in chancery's report, we must determine whether, under a correct application of the law, the evidence supports the findings of the commissioner or the conclusions of the [court]." Jampol v. Farmer, 259 Va. 53, 58, 524 S.E.2d 436, 439 (2000). To do so,

5

we review the evidence to determine which set of findings it supports. Parkes v. Gunter, 168 Va. 94, 98, 190 S.E. 159, 160 (1937). We review the legal holdings de novo. E.g., Ladysmith Rescue Squad, Inc. v. Newlin, 280 Va. 195, 200, 694 S.E.2d 604, 607 (2010).

We granted the Carlsons an appeal on seven assignments of error. Four present the questions of what duty a custodian of a UTMA account owes to its beneficiary, whether the Carlsons breached that duty, and, if so, what damages should be awarded. Another assignment presents the question of whether the circuit court erred in finding that the Carlsons did not properly trace the UTMA funds in their custody. The remaining assignments present the question of who, if anyone, is entitled to an award of attorneys' fees.[5]

A. STANDARD OF CARE FOR UTMA CUSTODIANS

The Carlsons do not assign error to the circuit court's factual finding that Jon's 2002 investment in US Airways was speculative because "he knew [the company] was in financial trouble, and was gambling on 'buy low-sell high' success." Rather, they merely contend that the standard of care for UTMA custodians permitted such speculation.

---

[5] The Carlsons have not assigned error to the part of the circuit court's judgment awarding the Plaintiffs costs and commissioner's fees and those awards therefore are final. Rule 5:17(c).

At the time relevant to this case, Code § 31-48(B)

provided that

> [i]n dealing with custodial property, a
> custodian shall observe the standard of care
> that would be observed by a prudent person
> dealing with such person's own property and is
> not limited by any other statute restricting
> investments by fiduciaries.  If a custodian has
> a special skill or expertise or is named
> custodian on the basis of representations of a
> special skill or expertise, the custodian shall
> use that skill or expertise.  However, a
> custodian, in the custodian's discretion and
> without liability to the minor or the minor's
> estate, may retain any custodial property
> received from a transferor.

Former Code § 31-48 (2001).[6]

Analyzing the statute, the circuit court found that its

language mirrored the common law standard of care for

fiduciaries prior to the 1956 enactment of a statutory standard

in former Code § 26-45.1.[7]  While the court considered several

---

[6] The General Assembly amended the statute in 2007 to
incorporate the Uniform Prudent Investor Act, Code §§ 26-45.3
to -45.14 (the "UPIA").  2007 Acts ch. 517.

[7] See also Hoffman v. First Virginia Bank of Tidewater, 220
Va. 834, 263 S.E.2d 402 (1980).  The statutory standard
provided that, except with regard to specific investments
subject to statutory safe harbors created by other sections of
the Code,

> an executor, administrator, trustee, or other
> fiduciary . . . shall exercise the judgment of
> care under the circumstances then prevailing,
> which men of prudence, discretion and
> intelligence exercise in the management of their
> own affairs, not in regard to speculation but in
> regard to the permanent disposition of their

of our precedents applying the common law standard, it distinguished them on the ground that they arose from suits for waste brought against fiduciaries by beneficiaries whose assets had been lost when investments had not been liquidated or bank deposits had not been withdrawn.

Seeking further guidance, the court then turned to Buder v. Sartore, 774 P.2d 1383 (Colo. 1989), a Colorado case analyzing that state's standards for custodians under its Uniform Gifts to Minors Act and the UTMA.  Applying Buder, the circuit court found that the Carlsons had a duty to preserve the principal of the UTMA funds and that Jon's speculative investment in US Airways stock violated that duty.  The court reasoned that, under the common law standard, a fiduciary is liable for breaches concerning specific investments regardless of the performance of the portfolio as a whole.  Consequently, the Carlsons were liable to the Children for the $40,000 lost in the US Airways investment.

---

> funds, considering the probable income as well
> as the probable safety of their capital.

1956 Acts ch. 660.  Although Code § 26-45.1 was subsequently amended, we determined that its original terms "merely incorporated the principle long established by our case law that, unless a trust instrument provides otherwise, the 'prudent [person] rule' will be applied to the management of assets by a fiduciary."  Hoffman, 220 Va. at 840, 263 S.E.2d at 406.

On appeal, the Carlsons argue that because Code § 8.01-2 does not list UTMA custodians as fiduciaries the only standard applicable to UTMA custodians is the one set forth in former Code § 31-48(B). Emphasizing the phrase "a custodian shall observe the standard of care that would be observed by a prudent person dealing with such person's own property," they assert that Jon's 2002 investment was reasonable and comported with the standard both because Jon made a similar, profitable investment in the 1990s and because he invested his own funds with the Children's UTMA funds in 2002. We disagree.

The phrase "a prudent person dealing with such person's own property" is a term of art invoking the common law Prudent Person Rule and effectively imposing the common law duties of trustees on UTMA custodians. The Prudent Person Rule is stated in Restatement (Second) of Trusts § 174 as a duty "to exercise such care and skill as a [person] of ordinary prudence would exercise in dealing with his own property; and if the trustee has or procures his appointment as trustee by representing that he has greater skill than that of a [person] of ordinary prudence, he is under a duty to exercise such skill." It is clear that the Prudent Person Rule embodied in the Restatement is consistent with Virginia's common law prior to the enactment of any statutory standard. See Harris v. Citizens Bank & Trust Co., 172 Va. 111, 125, 200 S.E. 652, 657 (1939) ("[T]rustees,

9

executors and other fiduciaries . . . are required to do those things which a [person] of reasonable intelligence and prudence would be expected to do in the management of his own affairs . . . ."); accord Commercial & Savings Bank of Winchester v. Burton, 183 Va. 133, 150, 31 S.E.2d 289, 296 (1944); Parsons v. Wysor, 180 Va. 84, 89, 21 S.E.2d 753, 755 (1942); Powers v. Powers, 174 Va. 164, 171, 3 S.E.2d 162, 165 (1939).

As constrained by the Prudent Person Rule, the Carlsons had "a duty to the [Children] to use reasonable care and skill to preserve" the UTMA funds.  Restatement (Second) of Trusts § 176.  Accordingly, Jon had a duty to make "only such investments as a prudent [person] would make of his own property having in view the preservation of the estate."  Restatement (Second) of Trusts § 227(a).  However that standard is not met whenever a fiduciary to whom the Rule applies invests his beneficiary's money however he invests his own.  Rather, the Restatement clarifies that while "a [person] of intelligence may make a disposition which is speculative in character with a view to increasing his property instead of merely preserving it[, s]uch a disposition is not a proper trust investment, because it is not a disposition which makes the preservation of the fund a primary consideration."  Restatement (Second) of Trusts § 227, cmt. e; see also Stewart E. Sterk, Rethinking Trust Law Reform:  How Prudent is Modern

10

Prudent Investor Doctrine?, 95 Cornell L. Rev. 851, 853 (2010) (Under the Prudent Person Rule, "trustees were not to make 'speculative' investments."); C. Boone Schwartzel, Is the Prudent Investor Rule Good for Texas?, 54 Baylor L. Rev. 701, 705 (2002) (The Prudent Person Rule emphasizes "safety, preservation of the trust corpus, and income productivity."); Paul G. Haskell, The Prudent Person Rule for Trustee Investment and Modern Portfolio Theory, 69 N.C. L. Rev. 87, 94 (1990) ("Under the prudent person rule, any speculative investment is a breach of trust.")

Thus, the standard imposed by former Code § 31-48(B) is not met merely because Jon's previous investments in US Airways had been profitable or because Jon invested his own money with the Children's UTMA funds in 2002. The evidence presented to the commissioner, considered by the circuit court, and unchallenged on appeal establishes that Jon knew at the time he used the Children's UTMA funds to purchase US Airways stock that the company was on the brink of bankruptcy. Consequently the circuit court found the investment to be speculative. It therefore violated the Prudent Person Rule's standard of care as imposed by former Code § 31-48(B).

The Carlsons next assert that the overall return on the UTMA funds while in their custody offsets the loss of value in US Airways stock and that former Code § 26-45.1 required the

11

circuit court to evaluate their overall performance rather than consider the US Airways investment in isolation.  We again disagree.[8]

The conduct of fiduciaries held to the Prudent Person Rule is evaluated with respect to each individual investment.  The performance of an investment portfolio as a whole is not considered.  Haskell, 69 N.C. L. Rev. at 93 (Under the Prudent Person Rule, "the standard of prudence is applied to each investment in isolation. Each investment is either in compliance or it is not, without regard to its relationship to other investments in the portfolio. The trustee is liable for loss in value of any improper investment, without regard to the performance of any other investment, proper or improper, or to the performance of the portfolio as a whole."); see also Restatement (Second) of Trusts § 213 ("A trustee who is liable for a loss occasioned by one breach of trust cannot reduce the amount of his liability by deducting the amount of a gain which has accrued through another and distinct breach of trust.").

In both respects – the prohibition on speculation and the evaluation of each investment in isolation – the Prudent Person Rule admittedly is anachronistic.  The divergence between outdated capital-preservation investment strategies and modern

---

[8] We note that former Code § 26-45.1 was repealed in 1999 and had no effect at the time Jon purchased the US Airways stock.  1999 Acts ch. 772.

portfolio management is the motivating force behind states'
replacement of the Prudent Person Rule with the Prudent
Investor Rule. This especially was true as inflationary
pressures from the 1970s to mid-1990s had an erosive effect on
trust corpuses locked in relatively low-return investments. By
contrast, the Prudent Investor Rule permits fiduciaries to
engage in reasonable speculation to benefit from the higher
returns of modestly riskier investments, while concomitantly
shifting the focus of evaluating the fiduciary's conduct from
the performance of individual investments to the portfolio as a
whole. Sterk, 95 Cornell L. Rev. at 853-54 (noting that the
prudent investor rule accommodates modern investment portfolio
management theory); Schwartzel, 54 Baylor L. Rev. at 713-14
(same); Haskell, 69 N.C. L. Rev. at 93-94 (same).

The Prudent Investor Rule does not apply to this case,
however. Though the General Assembly enacted the UPIA in 1999,
see 1999 Acts ch. 772, it did not then apply the new standard
to custodians of UTMA accounts. The Prudent Person Rule
continued to apply through Code § 31-48(B) until 2007, when
that section was amended to incorporate the UPIA. 2007 Va.
acts ch. 517. At the same time, the legislature amended Code
§ 26-45.13 to include UTMA custodians among the fiduciaries
covered by the UPIA. Id. Consequently, the Prudent Person
Rule applied to the Carlsons at the time Jon made the

13

speculative investment in US Airways.  Thus, that investment breached his duty of care and we affirm the circuit court's ruling that the Carlsons are liable to the Children for the UTMA funds lost as a result.

### B.  TRACING THE COMMINGLED UTMA FUNDS

The Carlsons argue that the circuit court failed to defer to the commissioner's factual finding that the UTMA funds were accounted for and erroneously substituted its own interpretation of the evidence.  We disagree.

The commissioner found that all UTMA funds were traceable but that $3600 was used for improper purposes.  However, the commissioner's report failed to address whether the Plaintiffs bore the burden of proving that UTMA funds were missing or whether the Carlsons bore the burden of proving that all funds were accounted for, and failed to state what evidence the commissioner considered in evaluating whether that burden had been met by the appropriate party.  By contrast, the circuit court began its examination of the UTMA funds with an analysis of the applicable burden of proof.

The circuit court first noted that Code § 31-48(E) requires a UTMA custodian to "keep records of all transactions with respect to custodial property."  It then found that the Carlsons and their expert could not account for all funds that had been removed from the various individual UTMA accounts,

14

commingled in the BOA 866 account, and then transferred to several of Jon's personal accounts, ostensibly for the Children's benefit.

Finding no cases specifically dealing with the burden of proof for an accounting of UTMA funds, the circuit court turned to our decision in Tauber v. Commonwealth, 263 Va. 520, 562 S.E.2d 118 (2002). In that case we determined that when trustees commingle their property with trust property and subsequently seek to separate their own property from the assets of the trust, they bear "the burden of proving how much of the commingled funds they owned personally." Id. at 541, 562 S.E.2d at 129. The burden lies on the trustees because they are required to account for the trust assets, and if they "conduct their affairs in a manner that prevents a precise accounting of trust assets, the trustees, rather than the trust, must suffer the consequences." Id. The circuit court also considered Vaiden v. Stubblefield, 69 Va. (28 Gratt.) 153, 162 (1877), and Bain v. Pulley, 201 Va. 398, 403, 111 S.E.2d 287, 291 (1959), in which we applied the same burden to the executor of an estate and an agent for property entrusted to him by a principal, respectively.

Because Jon admitted to commingling the UTMA funds in the BOA 866 account and then transferring them into his personal accounts, the circuit court held that Jon

15

has the burden of proving that the funds committed to his care were properly used by him. Attempts to follow the children's funds are made more difficult as they were transferred into three or four accounts in Jon's name, and there were additional transfers back and forth between those accounts. This conduct "prevents a precise accounting" and therefore Jon should bear the burden of untangling matters.

We find the circuit court's reasoning sound. The custodian of a UTMA account has a statutory duty to keep records of the custodial funds. When the custodian commingles his own funds with the custodial funds, he does so at his peril. Any failure to maintain clear and accurate records distinguishing his funds from the custodial funds places the custodian's funds in jeopardy. This approach is pragmatic and sensible, for it is the custodian who chooses to commingle the funds and it is the custodian who knows to what purpose he has used them. It is far simpler for him to record his transactions as he makes them than for the beneficiary to attempt to reconstruct the transactions after the fact. Accordingly, the Carlsons bore the burden of establishing that each transfer from the BOA 866 account was used for a proper purpose.

The circuit court found that the Carlsons had not met this burden. The court then attempted to trace the transactions questioned by the Plaintiffs. Of $177,006.81 in questioned transactions, the court found that $19,910.88 could not be

16

traced to a proper purpose.[9]  The Carlsons contend that the commissioner's factual finding that only $3600 was untraceable to proper purposes is the only finding supported by the evidence.  We disagree.

After reviewing the accounting submitted by the Carlsons and the testimony of their expert, we find that the circuit court correctly determined that $3,910.88 was not properly traced to proper purposes.  Two transactions found to be untraceable by the circuit court, a $5000 transfer in June 2003 and a $11,000 transfer in October 2003, are traceable to deposits into the BOA 866 account.  Accordingly, the circuit court erroneously determined that $16,000 was untraceable and we will reverse that portion of its judgment.

### C.  ATTORNEYS' FEES

The Carlsons assign error to the circuit court's failure to award them attorneys' fees and its award of fees to the Plaintiffs.  The principal ground for their challenge is that the Carlsons substantially prevailed below and the Plaintiffs did not.  We disagree.

We note that both the commissioner and the circuit court found that James abdicated his statutory duties as a custodian. The Carlsons have not assigned error to these findings and

---

[9] The Plaintiffs have not assigned cross-error to the circuit court's determination that the remaining $157,095.93 was properly traced.

17

appear to shrug off this condemnation. Their position reflects disrespect for the gravity of the responsibilities assumed by one who agrees to serve as a custodian under the UTMA. We believe the General Assembly acted purposefully when it imposed the obligations found in the statutes. Those obligations may not be treated casually or with cavalier disregard.

Similarly, Jon admitted to commingling UTMA funds into a single account for all the Children, despite the requirement in Code § 31-48(D) that a custodian "at all times shall keep custodial property separate and distinct from all other property in a manner sufficient to identify it clearly as custodial property of the minor" for whose benefit it is held. He likewise admittedly failed to permit an inspection of the records of the UTMA accounts between December 2003, when Eric first demanded an inspection, and May 2005, despite Code § 31-48(E)'s requirement that a custodian make such records available "for inspection at reasonable intervals by a parent or legal representative of the minor or by the minor if the minor has attained the age of fourteen years." His ignorance of or indifference to his statutory obligations is perhaps explained, though in no way excused, by his continuing misapprehension that he was "a father who at all times . . . was investing his own money for his children" rather than the

18

mere custodian of property <u>owned by the Children</u> and entrusted to his care.  (Emphasis added.)

In short, the Carlsons appear never to have grasped the import of their roles as custodians.  This was a grave misunderstanding on their part as it led them to breach their statutory obligations to the detriment of the Children and the diminution of the funds entrusted to the Carlsons' care.  In light of the circuit court's findings, there can be no plausible contention that the Carlsons substantially prevailed below.  Although the Carlsons argue that their attorneys' fees are a reasonable expenditure for which they are entitled to reimbursement under Code § 31-51 – because the costs of litigation would not have been incurred had the Plaintiffs not brought and maintained this action – it is clear that the Plaintiffs were justified in bringing the action to compel the accounting and recovery of the untraceable or misused funds.  Accordingly, the Carlsons' assertion that the circuit court erred in failing to award them attorneys' fees is without merit.

The Carlsons also contend the circuit court erred in awarding the Plaintiffs attorneys' fees because the Plaintiffs did not substantially prevail below.  We may dispose of this argument swiftly.

In their complaint, the Plaintiffs sought an accounting of the UTMA funds. They received an accounting more than a year after the complaint was filed. They also sought removal of the Carlsons as custodians. Though James had long before abandoned his role and left management of the two UTMA accounts entrusted to his care to Jon, Jon resigned and surrendered the UTMA funds to the Plaintiffs after the complaint was filed. The Plaintiffs also sought compensatory damages. Both the commissioner and the circuit court found the Children were entitled to compensatory damages. The only relief the Plaintiffs sought which they did not receive as a result of filing the complaint was an award of punitive damages.[10] We therefore find that the Plaintiffs were the prevailing parties below.

Nevertheless, "[t]he general rule in this Commonwealth is that in the absence of a statute or contract to the contrary, a court may not award attorney's fees to the prevailing party." Prospect Dev. Co. v. Bershader, 258 Va. 75, 92, 515 S.E.2d 291, 300 (1999). In Prospect Development, we noted several exceptions to the rule:

> For example, we have permitted a prevailing party, who prosecuted a cause of action for malicious prosecution or false imprisonment, to recover attorney's fees. Burruss v. Hines, 94

---

[10] The Plaintiffs have not assigned cross-error to the circuit court's denial of punitive damages.

20

Va. 413, 420, 26 S.E. 875, 878 (1897); Bolton v. Vellines, 94 Va. 393, 404, 26 S.E. 847, 850 (1897).

> We have held that "where a breach of contract has forced the plaintiff to maintain or defend a suit with a third person, he may recover the counsel fees incurred by him in the former suit provided they are reasonable in amount and reasonably incurred." Owen v. Shelton, 221 Va. 1051, 1055-56, 277 S.E.2d 189, 192 (1981); accord Fidelity Nat. Title Ins. Co. v. Southern Heritage Title Ins. Agency, Inc., 257 Va. 246, 253-54, 512 S.E.2d 553, 557-58 (1999); Hiss v. Friedberg, 201 Va. 572, 577-78, 112 S.E.2d 871, 875-76 (1960). We have permitted a trustee, who defended his trust in good faith, to recover attorney's fees from the estate, Cooper v. Brodie, 253 Va. 38, 44, 480 S.E.2d 101, 104 (1997), and we have approved an award of attorney's fees in certain cases involving alimony and support disputes even though such awards of attorney's fees were neither authorized by statute nor by contract. See Carswell v. Masterson, 224 Va. 329, 331-32, 295 S.E.2d 899, 900-01 (1982); Alig v. Alig, 220 Va. 80, 86, 255 S.E.2d 494, 498 (1979); McKeel v. McKeel, 185 Va. 108, 116-17, 37 S.E.2d 746, 750-51 (1946); McClaugherty v. McClaugherty, 180 Va. 51, 69, 21 S.E.2d 761, 768 (1942); Heflin v. Heflin, 177 Va. 385, 399-400, 14 S.E.2d 317, 322 (1941).

Id. at 92, 515 S.E.2d at 300-301. We concluded that "in a fraud suit, a chancellor, in the exercise of his discretion, may award attorney's fees to a defrauded party." Id. at 92, 515 S.E.2d at 301. In addition, in Tauber, we opined that "a longstanding course of self-dealing . . . would have supported an award of attorneys' fees" but declined to reverse a circuit

21

court's denial of such fees as an abuse of discretion. 263 Va. at 547, 562 S.E.2d at 133.

The Carlsons argue that there was no evidence that they "engaged in callous, deliberate, deceitful acts," id. at 546, 562 S.E.2d at 133 (quoting Prospect Development, 258 Va. at 92, 515 S.E.2d at 301), and there was no finding of intentional wrongdoing, fraud, or self-dealing. We disagree.

The Carlsons callously disregarded their custodial obligations under the UTMA. They deliberately withheld the records of the UTMA accounts from the Plaintiffs for more than a year. Those records, once produced and examined by the commissioner and the circuit court, revealed that Jon had commingled the UTMA funds from the Children's various individual accounts into a single account, in violation of Code § 31-48(E). Thereafter, he used a charitable contribution made from UTMA funds to the Children's school as a charitable deduction on his personal income tax return and used UTMA funds to reimburse himself for a child support payment he made to Wells, in violation of Code § 31-50. In this case, these facts are sufficient to establish a "pattern of misconduct," Prospect Development, 258 Va. at 92-93, 515 S.E.2d at 301, specifically a pervasive, wanton dereliction of the duties imposed by the General Assembly on UTMA custodians. Accordingly, we find no

22

error in the circuit court's award of attorneys' fees to the Plaintiffs.

### III. CONCLUSION

We will affirm the circuit court's judgment with respect to its finding that Jon violated the custodial standard of care provided in former Code § 31-48(B) by speculatively investing $40,000 in US Airways stock. We will affirm the circuit court's judgment with regard to allocating the burden of proof to the custodians after finding that the Carlsons had impermissibly commingled UTMA funds, but we will reverse its finding that $16,000 in UTMA funds was untraceable or misused. We will affirm the circuit court's judgment as to the award of attorneys' fees to the Plaintiffs and the denial of such fees to the Carlsons.

In assessing the respective liability of Jon and James for the losses in UTMA funds, the circuit court ruled that James was liable for 83% of the losses to the UTMA funds owned by Eric and Scott as a result of his custodianship of the 595 and 980 money market accounts, that Jon was liable for 17% of Eric and Scott's losses as a result of his custodianship of the other accounts held for their benefit, and that Jon was liable for 100% of Ariel's losses. The court also allocated Scott $5000 less than Eric or Ariel for the $40,000 loss attributable to the US Airways investment. No party has assigned error to

23

these allocations by the circuit court.  We therefore will rely on them for the entry of final judgment.

We will enter final judgment of $16,303.63 in compensatory damages to Eric, $11,303.62 to Scott, and $16,303.63 to Ariel, of which James is liable for $22,914.02 and Jon is liable for $20,996.86.  We also will enter final judgment of $33,102.03 in attorneys' fees, commissioner's fees, and costs to the Plaintiffs for which James and Jon are jointly and severally liable.

Affirmed in part,
reversed in part,
and final judgment.

24