COURT OF APPEALS OF VIRGINIA

Present:    Judges AtLee, White and Senior Judge Humphreys
Argued by videoconference

SHARON ELIZABETH FURR

                                                  MEMORANDUM OPINION* BY
v.        Record No. 0198-22-4          JUDGE ROBERT J. HUMPHREYS
                                                      SEPTEMBER 2, 2025
TAMARA AL-SARAY


FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
James A. Willet,[1] Judge

Julie S. Palmer (Frank E. Hudson, III; David W. Drash; Harman,
Claytor, Corrigan & Wellman, PC; Teumer & Drash, on briefs), for
appellant.

Stephen M. Terpak (Sutter & Terpak, PLLC, on brief), for appellee.


This appeal returns to the Court on remand from the Supreme Court.  *Al-Saray v. Furr*,

___ Va. ___ (Jan. 16, 2025).  Sharon Elizabeth Furr appeals a judgment awarding Tamara

Al-Saray $7 million for damages sustained in a traffic accident.  Furr contends that the trial court

erred by refusing a proffered jury instruction and denying her motion for a mistrial based on

comments Al-Saray's counsel made during closing argument.  She also argues that the trial court

abused its discretion by denying her motion for a continuance so that one of her experts could

examine Al-Saray, as permitted under Rule 4:10, and by limiting the scope of her experts'

testimony at trial.  Finally, she contends that the trial court erred by denying her motion to reduce

the suspension bond under Code § 8.01-676.1, and she asks this Court to reduce the bond on

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] The Honorable James A. Willett entered the final judgment.  The Honorable Carroll A.
Weimer, Jr., presided over many of the parties' pre-trial motions in 2021, including the hearings
for sanctions and restricting witness testimony.

appeal.[2]  For the following reasons, we affirm the circuit court's judgment and deny Furr's request to reduce the suspension bond.

## BACKGROUND

### I.  The Accident

Around 4:30 p.m. on November 10, 2014, Furr's vehicle collided with a vehicle driven by Janaia Spurlock at the intersection of Wellington Road and Market Place Avenue in Prince William County.  Furr was travelling westbound on Wellington Road, a divided highway with four westbound lanes: a left turn lane, a left-thru lane, a right-thru lane, and a right turn lane that led into a shopping center.  Spurlock was travelling eastbound on Wellington Road with two passengers; her grandfather was in the front, passenger seat, and Al-Saray was in the back, passenger-side seat.

As Spurlock approached the intersection, she turned left toward the shopping center and entered the intersection under a solid green traffic light.  Furr's vehicle, which was travelling westbound at 45 miles per hour, entered the intersection and struck the rear, passenger portion of Spurlock's vehicle.  Furr was "going uphill" and had an unobstructed view of 300 to 400 feet before she entered the intersection, though she testified that she saw only a "white blur" before the collision.  Spurlock's grandfather died after the accident, though his cause of death "is unclear from the record." *Al-Saray*, ___ Va. at ___ n.1.  Al-Saray suffered significant injuries,

---

[2] Furr also challenged the sufficiency of the evidence to support the jury's verdict.  In a split opinion, this Court initially found that the evidence was insufficient to prove causation. *Furr v. Al-Saray*, No. 0198-22-4, slip op. at 1-2, 22 (Va. Ct. App. May 16, 2023).  Judge AtLee, dissenting, would have found the evidence sufficient to support the jury's verdict. *Id.*, slip op. at 23-28.  On appeal, the Supreme Court reversed this Court's majority opinion and remanded for consideration of Furr's remaining assignments of error. *Al-Saray*, ___ Va. at ___.

In addition, Furr also assigned error to a trial court judgment excluding evidence of a non-party's guilty plea to a traffic offense arising from the accident.  But Furr abandoned that assignment of error on appeal.

including a traumatic brain injury. Al-Saray filed claims against Furr and Spurlock. Before trial, however, she nonsuited her claim against Spurlock.

## II. Rule 4:10 Exam and Evidentiary Sanctions Motions

During pre-trial discovery, Furr moved for Dr. Gary Kay to conduct a Rule 4:10 neuropsychology exam of Al-Saray.[3] The trial court granted Furr's request, but its order granted Al-Saray permission to record the exam. Dr. Kay refused to conduct a recorded exam, asserting that it was "inconsistent" with the "requirements for standardized test administration" and raised ethical concerns. Dr. Kay ended his relationship with Furr without examining Al-Saray.

Furr then moved the court to order a Rule 4:10 exam by Dr. Jeffrey Wilken, a clinical neuropsychologist. Like Dr. Kay, however, Dr. Wilken would not conduct the exam if it was recorded. The trial court granted Furr's motion and removed the mandatory recording provision. The court ordered Al-Saray to "submit to an examination by Dr. Jeffrey A. Wilken." The exam was to "occur between April 1, 2021 and June 30, 2021 at a time agreeable" to Al-Saray and Dr. Wilken. The order also required the parties to set the date of the exam 30 days in advance, and the location was to be at an "independent location," not "any law office or attorney's office." Al-Saray was responsible for providing and paying for the exam location; otherwise, the court's order provided that the exam would be at Dr. Wilken's office. Dr. Wilken was to conduct the exam "by such means as are approved by the neuropsychological profession," avoiding "unnecessary pain or discomfort," and "prepare a written report."

In addition, the court's order provided that if Dr. Wilken refused to perform the exam, the parties could agree to a substitute examiner or, absent agreement, return to the court for another

---

[3] On the "motion of an adverse party," a court "may order the party to submit to a physical or mental examination by one or more health care providers" if "the mental or physical condition (including the blood group) of a party . . . is in controversy." Rule 4:10(a). Such an order "may be made only on motion for good cause shown and upon notice to the person to be examined and to all parties." *Id.*

order "allowing a particular substitute examiner." Regardless, the examiner had to "agree in writing" at least 30 days before the exam to be bound by the court's order. Dr. Wilken provided his written assent to the order's terms.

The parties agreed that Dr. Wilken would conduct the exam at 8:45 a.m. on June 22, 2021. Three days before the exam, Al-Saray's counsel emailed Dr. Wilken, detailing the "independent" location of the exam. The day before the exam, however, Dr. Wilken told Furr's attorney that he "would need time to set up testing on a different site" because he had "no idea that [the exam] would be anywhere but [his] office," and he had "other patients scheduled" for the exam date. To address the unexpected change in location, Dr. Wilken proposed that Dr. Catherine Bergmann, a colleague and licensed psychologist, could meet Al-Saray and "begin the testing," and Dr. Wilken would arrive to interview Al-Saray "after [his] morning patients." Then, Dr. Wilken would return to his office while Dr. Bergmann "complete[d] the testing."

On the day of the exam, Dr. Bergmann arrived at the independent location at 8:10 a.m., and Al-Saray arrived with her attorney at 8:45 a.m. Dr. Bergmann introduced herself to Al-Saray's counsel and explained that Dr. Wilken "would be coming later." Al-Saray's counsel refused to proceed with the testing, insisting that the court's order required only Dr. Wilken to administer the exam. After waiting for about 30 minutes, during which time Dr. Wilken did not arrive, Al-Saray left the exam location.

The parties filed competing motions for sanctions. Al-Saray argued that Furr and Dr. Wilken had violated the court's order by attempting to have someone other than Dr. Wilken conduct the exam. Al-Saray insisted that Dr. Wilken knew in advance that the exam would be at a neutral location but nevertheless worked with Furr's attorney to send Dr. Bergmann, who was not "vetted" or court-approved, in his place without providing Al-Saray any notice. Accordingly, she asked the court to strike Dr. Wilken as a defense witness.

- 4 -

Furr countered that Al-Saray had violated the court's order by not staying for the exam. She asked the court to strike Al-Saray's traumatic brain injury claim or, alternatively, for a continuance so Dr. Wilken could conduct a Rule 4:10 exam. Furr acknowledged that the case had "been going on for a long time" but argued that the Rule 4:10 exam was necessary and that completing one required a continuance.

The trial court questioned Furr about how Dr. Wilken would have performed the exam even if it was at his office given that he had other patient appointments scheduled. Furr proffered that "either way," Dr. Bergmann would have done the initial "testing," and then Dr. Wilken would have performed the interview. She argued that Dr. Bergmann was a licensed clinical psychologist and was acting under Dr. Wilken's supervision.

The trial court found that there had been a "tortured history . . . of trying to get a Rule 4:10 exam done." After considering all the circumstances, the court denied Furr's motions to sanction Al-Saray by striking her traumatic brain injury claim or continue the case so that Dr. Wilken could conduct a Rule 4:10 exam. The court denied Al-Saray's motion to prohibit Furr from presenting expert evidence but ruled that Dr. Wilken could not testify that Al-Saray "did not submit to his interview."

### III. Drs. Falconer and Wilken's "Second Accident" and Causation Testimony

Dr. Ramsey Falconer evaluated Al-Saray and her medical records before trial. Those medical records reveal that she had to be intubated in the emergency room immediately after the accident. She was concussed and suffered from "cognitive linguistic deficits." In the months following the accident, she also reported problems with back pain, balance, anxiety, and ability to concentrate and remember. By January 2015, however, she reported that she felt "85-90% recovered."

During a neurological exam in November 2015, Al-Saray reported "occasional headaches" and some "issues with sleep, attention and concentration." Neuropsychological testing in January 2016 revealed that Al-Saray had "superior visual memory skills and average verbal memory." Through 2021, however, Al-Saray received MRIs of her brain, which revealed "multiple punctate hypointense foci" and other evidence of injury. She also received treatment for auditory, visual, and linguistic deficits. In fact, a speech-language pathologist noted "[m]ild neurolinguistic decline" in May 2021.

Al-Saray visited Dr. Falconer's clinic in March 2020. After that visit, Dr. Falconer opined, to a reasonable degree of medical probability, that Al-Saray suffered "a concussive head injury/Traumatic Brain Injury" during the accident, which "result[ed] in the onset of post-concussive symptoms that included headaches, photophobia, balance problems, difficulty concentrating, irritability and visual problems." Dr. Falconer concluded that Al-Saray "saw resolution" of some of her symptoms in the months following the accident, and there were "no physical examination findings" during her March 2020 appointment that "could be attributable to the accident."

Continuing, Dr. Falconer noted that, based on notes in her medical records, Al-Saray had been "involved in a second [automobile] accident in August 2016, which per [a nurse practitioner] 'provoked her current symptoms.'" Consequently, Dr. Falconer also opined "to a reasonable degree of medical probability that . . . Al-Saray potentially suffered a 'second hit' phenomenon during the motor vehicle accident in August 2016, thus explaining the documented resolution of her symptoms in 2015 and the subsequent advancement of her symptoms to date." Dr. Falconer wrote, "To what degree the accidents of November 2014 and August 2016 played into her current issues is impossible to delineate, but both are likely at fault." He concluded that Al-Saray's "current deficits are likely permanent and will require lifelong accommodations."

Dr. Wilken's "peer review" report doubted whether Al-Saray had suffered "mild neurolinguistic decline in a number of domains." Yet, giving Al-Saray the "benefit of the doubt," Dr. Wilken opined that any "cognitive decline" occurred after 2016. Moreover, he wrote, "A person does not experience cognitive decline several years after a head injury, and this would suggest an alternate cause of cognitive deterioration (such as the 'second impact' syndrome suggested by Dr. Falconer)." Although Dr. Wilken conceded that Al-Saray "may have experienced transient post-accident, TBI-related psychiatric distress, this appears to have remitted after a few months. The recurrence of psychiatric distress and behavior symptomatology long after the actual accident suggests an alternative etiology (such as the 2016 accident) and cannot be attributed to the" accident with Furr.

Al-Saray moved *in limine* for the trial court to exclude Drs. Falconer and Wilken's opinions regarding an alleged "second accident" and causation of her current symptoms. She maintained that Dr. Falconer's opinions were "irrelevant," "speculative," and "not held or stated to medical probability." Rather, Dr. Falconer opined that it was "probable" that the alleged second accident "potentially" caused further symptoms, and a "probable possibility is not admissible." Al-Saray maintained mentioning the "second accident" would confuse the jury because it could imply the jury had to "somehow proportion injury," and the jury would receive no instruction "on how to compare damages."

Furr responded that she should be able to present facts and arguments related to the second accident because Dr. Falconer's opinions were based in fact, so were not speculative.[4] In addition, Furr wanted to argue that Al-Saray's second accident was a superseding cause of her current symptoms because she had "reached resolution" of her symptoms before the second

_____

[4] Furr acknowledged that Dr. Falconer's report "substantially" represented what his testimony would be.

accident. Furr acknowledged that only Dr. Falconer would "testify about how to delineate the damages" between the two accidents. She also "concede[d]" that there was a "problem" with his "potentially language."

Regarding Dr. Wilken's opinion, Al-Saray argued that as a psychologist who "is called a neuropsychologist," he did not have a medical degree and was not qualified to diagnose a traumatic brain injury or opine as to causation of symptoms, including that there may be some "alternative etiology." Furr agreed with Al-Saray, in part, acknowledging that Dr. Wilken could not testify that the results of tests "cannot be attributed to brain injury." Even so, Furr insisted that Dr. Wilken should be permitted to testify that a typical "person does not demonstrate the onset of executive dysfunction several years after a head injury" and that there may have been an "alternative etiology."

Regarding Dr. Falconer, the trial court found, based on the phrasing in his report and Furr's expert designation, that he had not opined to a reasonable degree of medical probability that Al-Saray suffered a "second hit phenomenon," only that "she might have," which could cause the jury to speculate. Further, the court emphasized that Dr. Falconer could not discern any difference between the accidents in Al-Saray's symptoms. Consequently, the court held that Dr. Falconer could not testify "that it is [his] medical opinion to a reasonable degree of medical certainty that . . . Al-Saray potentially suffered a second hit." But the court ruled that Dr. Falconer could discuss the records he relied on, including that those records revealed a second accident that might be associated with her symptoms.

Turning to Dr. Wilken, the court found that he could opine that Al-Saray did not have "cognitive dysfunction," but he could not opine that she "doesn't have cognitive dysfunction from a head injury" because that relates to causation, which was "beyond his expertise."

Moreover, the court ruled that Dr. Wilken could not suggest that any cognitive decline was caused by an "alternative etiology," as that was "speculative."

## IV.  Jury Instruction T

At trial, Furr proffered alternative versions of Jury Instruction T.  Both instructions were derived from Code § 46.2-880, which includes "tables of speed and stopping distances of motor vehicles" that "courts shall take notice of."  One of the proffered instructions included the "full table" outlining the "feet per second," average stopping distance, and feet travelled during the average "reaction time" (1.5 seconds) at various speeds; the other included the applicable data for only the speed at which Furr was traveling before the accident.  The instructions concluded by explaining, "these averages are not binding upon you.  And if you find that the vehicle or highway conditions are different from those in developing these average stopping distances, you may take the differences into account in your deliberations."

Al-Saray objected to the instructions, arguing it was "discouraged" in the case law given the "factors" under which the tables' measurements were ascertained.  As there was no evidence of those factors in this specific case, Al-Saray contended that the instruction would confuse the jury and encourage them to "[t]ake the average" no matter what the applicable conditions were.  Furr countered that Code § 46.2-880 required the court to take "judicial notice" of the tables, and the "feet per second" portion of the table, by mathematical certainty, because it was agreed and stipulated that Furr was traveling 45 miles per hour.  Furr wanted the average reaction time, which was relevant because evidence demonstrated that she only had four seconds to react.

The court denied the instruction stating that "[c]ase law requires that each of the factors in the last paragraph be established by the evidence," and there was "no evidence to the condition of the vehicles."  After the trial court ruled, Furr added that Code § 46.2-880

acknowledges that deviations from the assumed circumstances may exist, but the table was still relevant. The trial court did not revisit its ruling.

## V. Closing Argument

During closing argument to the jury, Al-Saray's counsel contended that Furr had the "duty to yield to other vehicles and pedestrians lawfully within the intersection" as she approached it. Counsel argued that duty "obviously makes sense" because "you can't go 45 miles an hour into a sitting duck. You can't do it. People get killed. A grandfather gets killed, and you know what happens to [Al-Saray]." Furr did not object to that argument.

Al-Saray's closing argument then transitioned into addressing how far Furr's vehicle was from the intersection when Spurlock began her left turn. She discussed how Spurlock had to be "careful" with another vehicle that was in the intersection, and how Furr forfeited any right-of-way she had if she was speeding. Addressing the cause of her injuries and the damage she suffered, Al-Saray argued that before the accident she was full of "herself" and "promise," but "it's just the opposite now," and she expected that her "lifecare" plans would cost $7 million. Al-Saray attacked the opinions of Furr's experts and argued that Furr had poor vision and lied about it. She characterized Furr as someone who refused to acknowledge that she "killed a man" and "gave somebody else a brain injury." Al-Saray also argued that she needed "help" and reminded the jury that it could only "estimate" future damages and that it could award interest on any verdict.

After the above arguments, but before Al-Saray had concluded her argument, Furr objected and moved for a mistrial. She acknowledged that she did not object "at the time" but argued there was "no evidence" that Spurlock's grandfather had been killed. The trial court denied the motion for a mistrial, finding that Furr had "to object contemporaneously with the statement."

VI.  Motion to Set Aside the Jury's Verdict

The jury found Furr liable and awarded Al-Saray $7 million in damages.  Furr subsequently moved the trial court to set aside the jury's verdict and enter judgment in her favor or, alternatively, order a mistrial.  In relevant part, she argued that the court should set aside the jury's verdict because it should have granted proposed Jury Instruction T.  She maintained that Code § 46.2-880 had been amended since the "case law" that the trial court had relied on to refuse the proffered instructions, and those amendments clarified that deviations from the standard conditions underlying the calculations do not "negate the usefulness of the table."  She also contended that the court should grant a mistrial based on Al-Saray's improper closing argument that Furr had killed Spurlock's grandfather.

The trial court denied Furr's motion.  The court found that the proffered jury instructions would not have been "helpful to the jury" and were "misleading because there [was] not sufficient identity of facts established in the record to allow for that instruction."  The court also reiterated that Furr's motion for a mistrial was "too late."

VII.  Suspension Bond

Furr moved the trial court to set a $500,000 suspension bond under Code § 8.01-676.1.  She argued that her only asset to pay the judgment was her $500,000 liability insurance coverage.  Thus, she maintained that the court had "good cause" to not require her to submit the full amount of the judgment as a suspension bond.  After a hearing, the trial court denied the motion, finding that "good cause" was not established by Furr's lack of assets or the "depth" of her "pocket."

ANALYSIS

## I. Jury Instruction

"A trial court 'has broad discretion over whether to give or deny proposed jury instructions.'" *Taylor v. Commonwealth*, 77 Va. App. 149, 166 (2023) (quoting *Huguely v. Commonwealth*, 63 Va. App. 92, 129 (2014)). On appeal, our "'sole responsibility' in reviewing a challenge to jury instructions 'is to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'" *Id.* (quoting *Molina v. Commonwealth*, 272 Va. 666, 671 (2006)). If, however, the record does not "include a rejected jury instruction," we cannot address the "merits" and will "consider the issue waived." *Smith v. Commonwealth*, 281 Va. 464, 469 (2011) (citing *Paddock v. Mason*, 187 Va. 809, 812 (1948)). As the Supreme Court has explained, when assignments of error relate "to the rulings of the trial court on instructions offered by the parties," but the instructions "are not properly made a part of the record, . . . we cannot inquire into the propriety of the lower court's rulings with respect to them." *Paddock*, 187 Va. at 812. Indeed, it is well-established that an appellant must "present this Court with a record complete enough to demonstrate that the trial court" erred as alleged. *Wilkins v. Commonwealth*, 64 Va. App. 711, 716 (2015) (citing *Wansley v. Commonwealth*, 205 Va. 419, 422 (1964)). "In the absence [of a sufficient record], we will not consider the" asserted error. *Dixon v. Dixon*, 71 Va. App. 709, 716 (2020) (alteration in original) (quoting *Robinson v. Robinson*, 50 Va. App. 189, 197 (2007)).

As Furr concedes in her reply brief, the record does not include her proposed jury instructions that the trial court refused. Nevertheless, the record demonstrates that the parties vehemently disagreed on whether the proposed instructions clearly stated the law, as Al-Saray argued that they were not properly framed because they did not "explain [their] relevancy" and were "vague, misleading, [and] incomplete." Al-Saray also argued that the instructions "actually

offered experimental facts . . . rather than a pure instruction of the law," and were based on "only a partial view of the evidence." Without the proffered instructions, we cannot ascertain whether they clearly and correctly stated the law or whether the trial court abused its discretion by refusing them. *See Delcid-Solis v. Commonwealth*, No. 0532-23-2, slip op. at 3 (Va. Ct. App. Sept. 26, 2023) (holding that because the record did not "contain the text of the proposed jury instruction," this Court could not on appeal "determine whether they clearly state[d] the law"). Thus, Furr's jury instruction arguments are waived.

## II. Furr's Closing Argument

"A trial court's ruling denying a motion for mistrial will be set aside on appellate review only if the ruling constituted an abuse of discretion." *Gross v. Stuart*, 297 Va. 769, 774 (2019) (quoting *Allied Concrete Co. v. Lester*, 285 Va. 295, 308 (2013)). Generally, we "will not reverse the denial of a motion for a mistrial unless a manifest probability exists that the trial court's ruling was prejudicial." *Wright v. Commonwealth*, 52 Va. App. 690, 707 (2008) (en banc) (quoting *Perez v. Commonwealth*, 40 Va. App. 648, 654 (2003)). "Whether the words used were prejudicial must be judged by a review of the totality of the evidence." *Castillo v. Commonwealth*, 70 Va. App. 394, 446 (2019) (quoting *Fain v. Commonwealth*, 7 Va. App. 626, 629 (1989)).

Furr contends that Al-Saray's statements in closing argument that Spurlock's grandfather had died were inflammatory, intended to prejudice the jury, and required a mistrial. In addition, she asserts that she timely objected to the statements because Al-Saray had not finished her closing argument. However, we need not decide whether Furr's objection was timely, or whether the statements required a mistrial, because any error was harmless.

Harmless-error review is "required in *all* cases." *Moore v. Joe*, 76 Va. App. 509, 516 (2023) (quoting *Spruill v. Garcia*, 298 Va. 120, 127 (2019)). We will not reverse "a trial court

- 13 -

for errors 'that were harmless to the ultimate result.'" *Lienau v. Commonwealth*, 69 Va. App. 254, 269 (2018) (quoting *Carter v. Commonwealth*, 293 Va. 537, 544 (2017)).  Rather, if "it plainly appears from the record and the evidence . . . that the parties have had a fair trial on the merits and substantial justice has been reached, no judgment shall be arrested or reversed." *Moore*, 76 Va. App. at 516-17 (alteration in original) (quoting Code § 8.01-678).  "Where the trial court's error 'is not of a constitutional dimension, . . . [a]n appellate court can conclude that a non-constitutional error is harmless "if it can conclude that the error did not influence the jury or had but slight effect."'" *Commonwealth v. Paxton*, ___ Va. ___, ___ (May 29, 2025) (alterations in original) (quoting *Welsh v. Commonwealth*, ___ Va. ___, ___ (Mar. 20, 2025)).

The record reveals that the jury repeatedly heard that Spurlock's grandfather died during the accident.  During opening argument, for example, Al-Saray's counsel stated that Furr "knows that this is the kind of accident that can kill people" and that the accident "killed the elderly gentleman in the right front seat."  Furr did not object to that statement.  Then, at trial, Al-Saray's counsel asked a witness if they had "heard that the other passenger was dead from the accident."  Furr's counsel objected to the question as irrelevant, but the court overruled the objection after Al-Saray argued that the death demonstrated the "[s]everity of the accident," and Furr does not assign error to that ruling on appeal.  Al-Saray's counsel then re-asked the witness if Furr ever mentioned "a man in the front of the car being dead because of the accident."  The witness denied knowing that he had died but agreed that Furr told her "at some point[, Furr] saw an older man being pulled out of [the other] vehicle."  The witness also stated that after seeing Furr's car, she was "surprised [Furr] made it out alive."  Given those circumstances, we conclude that any error in denying the motion for a mistrial after the jury yet again heard that Spurlock's grandfather had died was harmless.

III.  Rule 4:10 Exam and Evidentiary Sanctions

A "trial court generally exercises 'broad discretion' in determining the appropriate sanction for the failure to comply with an order relating to discovery." *Stark v. Dinarany*, 73 Va. App. 733, 745 (2021) (quoting *Walsh v. Bennett*, 260 Va. 171, 175 (2000)).  Similarly, the court has discretion to determine whether to grant a continuance. *Shah v. Shah*, 70 Va. App. 588, 593 (2019) (citing *Haugen v. Shenandoah Valley Dep't of Soc. Servs.*, 274 Va. 27, 33-34 (2007)).  On appeal, we review the trial court's rulings on both issues for an abuse of that discretion. *Stark*, 73 Va. App. at 745 (citing *Galloway v. Cnty. of Northampton*, 299 Va. 558, 563 (2021)); *Shah*, 70 Va. App. at 593.  Under that familiar standard, trial courts have "a range of choice," and we will not reverse their decision "as long as it stays within that range and is not influenced by any mistake of law." *Stark*, 73 Va. App. at 746 (quoting *Galiotos v. Galiotos*, 300 Va. 1, 10 (2021)).  Rather, "only when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Id.* (quoting *Galiotos*, 300 Va. at 11).

Furr argues that Dr. Wilken's Rule 4:10 exam of Al-Saray was necessary, rather than a mere "medical record review," so she could "fully" defend against Al-Saray's "claimed injuries." Furr contends that because the trial court ordered a Rule 4:10 exam that did not "go forward" because of miscommunication and "ambiguity" in the trial court's order, "it was an abuse of discretion . . . not to give [her] relief in the form of a continuance and opportunity for re-examination."  She emphasizes that the order allowed the exam to be "conducted by such means as are approved by the neuropsychological profession," which Dr. Wilken understood to permit another doctor to begin the testing.  In addition, she maintains that the court erred by granting Al-Saray's sanction motion to prevent Dr. Wilken from explaining why he had not examined Al-Saray.

"When the mental or physical condition . . . of a party . . . is in controversy, the court in which the action is pending" on motion "may order the party to submit to a physical or mental examination by one or more health care providers . . . employed by the moving party." Rule 4:10(a). "The order may be made only on motion for good cause shown and upon notice to the person to be examined and to all parties." *Id.* In addition, the court's order "*must specify* the time, place, manner, conditions, and scope of the examination and *the person or persons* by whom it is to be made." *Id.* (emphases added). Finally, the order "must fix the time for filing the reports" after any such examination. *Id.*

Here, Dr. Kay refused to comply with the trial court's first order requiring a recorded Rule 4:10 exam, so the trial court granted Furr's motion for a second exam by Dr. Wilken. The court's second order complied with Rule 4:10's specificity requirements. Namely, it specified the time and acceptable dates for the exam. It detailed that the exam would have to occur at a neutral location that was not a law office, at Al-Saray's expense, or failing that, at Dr. Wilken's office. The order also outlined the scope of both the exam and "all [permissible] communications" between Al-Saray and Dr. Wilken. In addition, although Rule 4:10 contemplates that more than one doctor may conduct such an exam, it requires that the order permitting the exam must identify the "person or persons by whom it is to be made." The trial court's order identified only one examiner—Dr. Wilken. Indeed, even *Furr's* motion for a second exam identified only Dr. Wilken, not Dr. Bergmann, as the examiner. The court's order granting that request clarified that if Dr. Wilken was unwilling or able to perform the exam, the

parties could consent to another examiner or, failing agreement, return to the court for further order.[5]

Despite the order's plain and unambiguous terms, when Dr. Wilken emailed Furr's counsel the night before the exam to suggest that Dr. Bergmann start the exam (because Dr. Wilken had other patients scheduled at his office),[6] Furr agreed to the proposal, and when Al-Saray objected, Furr insisted that she return to complete the exam. Furr's position, however, violated the plain and unambiguous terms of the court's order, which did not identify Dr. Bergmann as an examiner.

Given the above circumstances, we find no abuse of discretion in the trial court's denial of yet another continuance for yet another opportunity for a Rule 4:10 examination. As the trial court found, this case involved a "tortured history . . . of trying to get a Rule 4:10 exam done." The trial court already had issued two Rule 4:10 exam orders for Furr, but her chosen examiners in both instances either objected to the court's order or failed to arrange their schedules so that they could conduct the exam. In addition, when Furr moved to continue the trial yet again, nearly seven years had passed since the accident, and the trial court had already twice continued the trial. *See Silcox v. Commonwealth*, 32 Va. App. 509, 514 (2000) (holding that a court did not

---

[5] Furr contends that because the court's order provided that the exam should be conducted "by such means as are approved by the neuropsychological profession," it was appropriate for Dr. Bergmann to start the exam, consistent with Dr. Wilken's understanding of "standard" practice. That paragraph of the court's order, however, refers to the method by which the exam was to be conducted, not who would conduct the exam. On that point, the order unambiguously identified only Dr. Wilken as the examiner, or a substitute examiner if the parties could agree, not Dr. Bergmann. Furr could have asked to include Dr. Bergmann as an examiner in the court's order, but she did not.

[6] Although Dr. Wilken told Furr that he had "no idea that [the exam] would be anywhere but [his] office," he provided his written confirmation that he could and would abide by the court's order, and that order plainly provided that the exam could be conducted at an "independent" neutral location, and only failing Al-Saray's ability to arrange such a location would the exam be conducted at his office.

abuse its discretion by denying a motion to continue because, in part, the case had already been continued at the appellant's request).

Nor did the court abuse its discretion by holding that Dr. Wilken could not explain to the jury why he did not examine Al-Saray. Generally, trial courts have broad discretion to manage "the conduct of a trial." *Justus v. Commonwealth*, 222 Va. 667, 676 (1981). Courts must also exercise discretion in deciding whether to exclude evidence as irrelevant, or even relevant evidence that presents a "danger of distracting the jury from the major issues in this case." *Byrd v. Commonwealth*, 30 Va. App. 371, 376 (1999) (citing *Maynard v. Commonwealth*, 11 Va. App. 437, 442 (1990) (en banc)). Here, the trial court was concerned about the parties litigating to the jury who was "at fault" for Dr. Wilkin's unsuccessful Rule 4:10 exam. That issue was tangential to, and would distract from, the major issues in this case, including Furr's liability and the extent and nature of Al-Saray's injuries. *See Pegasystems Inc. v. Appian Corp.*, 81 Va. App. 433, 499 n.30 (2024) (suggesting that "concern regarding a drawn-out and unnecessary 'trial within a trial'" could be a "proper basis for exclusion of evidence"). Thus, the court did not abuse its discretion by ruling, as part of its evidentiary sanction against Furr, that Dr. Wilken could not explain to the jury why he had not examined Al-Saray.

## IV. Limits on Drs. Falconer and Wilken's Testimony

"The admission of expert testimony is a matter within the sound discretion of the trial court, and we will reverse the trial court's judgment only when the court has abused this discretion." *Toraish v. Lee*, 293 Va. 262, 268 (2017) (quoting *Keesee v. Donigan*, 259 Va. 157, 161 (2000)). As noted above, "only when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Stark*, 73 Va. App. at 746 (quoting *Galiotos*, 300 Va. at 11).

Furr argues that the trial court abused its discretion by limiting Drs. Falconer and Wilken's testimony. She insists that the trial court should have permitted Dr. Falconer to offer

his opinion that Al-Saray "potentially suffered a 'second hit' phenomenon during" a second automobile accident in August 2016, which contributed to her present symptoms, even though it was "impossible to delineate" what role each accident had in her symptoms. And she maintains that the trial court should have permitted Dr. Wilken to opine that the recurrence of Al-Saray's symptoms following initial resolution "suggest[ed] an alternate cause of cognitive deterioration" other than the original accident, or an "alternative etiology."

A. Dr. Falconer's Equivocal Opinion

When the physical condition of a party is at issue in a civil action, the diagnoses of medical experts about that condition are inadmissible unless expressed to "a reasonable degree of medical probability." Code § 8.01-399(B). "Any testimony about a diagnosis that a medical expert admits is not competent to a reasonable degree of medical certainty is inadmissible and speculative." *Farrell v. Warren Cnty. Dep't of Soc. Servs.*, 59 Va. App. 375, 430 (2012) (citing *Pettus v. Gottfried*, 269 Va. 69, 78 (2005)). Indeed, the very purpose of Code § 8.01-399(B) "is to define the scope of . . . trial testimony . . . when the physical or mental condition of a patient is at issue in a civil action." *Pettus*, 269 Va. at 77.

Under that standard, the Supreme Court has held that a medical expert's testimony that there was a "possibility" that the defendant suffered from a mental defect on a specific date was inadmissible. *Spruill v. Commonwealth*, 221 Va. 475, 479 (1980). The Court explained that a "medical opinion based on a 'possibility' is irrelevant" and "purely speculative." *Id.* "[F]or such testimony to become relevant, it must be brought out of the realm of speculation and into the realm of reasonable probability; the law in this area deals in 'probabilities' and not 'possibilities.'" *Id.*

Dr. Falconer opined "to a reasonable degree of medical probability that . . . Al-Saray *potentially* suffered a 'second hit' phenomenon during" the second accident in August 2016.

(Emphasis added). Further, he explained that both accidents "likely" contributed to her current symptoms, but that it was "impossible to delineate" their proportional "degree." That opinion does not escape the realm of speculation. Dr. Falconer does not opine to a reasonable degree of medical probability that Al-Saray suffered a "'second hit' phenomenon," only that she "potentially" did, and even then, he could offer no opinion on the relative extent that each accident contributed to her current symptoms. As phrased, his opinion is speculative and inadmissible. Thus, the trial court did not abuse its discretion by excluding it.

B. The Scope of Dr. Wilken's Expertise

"An expert witness must be 'qualified as an expert by knowledge, skill, experience, training, or education' on the subject" of his testimony. *Stevens v. Commonwealth*, 72 Va. App. 546, 559 (2020) (quoting Va. R. Evid. 2:702(a)(i)). To meet this standard, the "record must show that the proffered expert witness has sufficient knowledge, skill, or experience to render [him] competent to testify as an expert on the subject matter of the injury." *Molina v. Commonwealth*, 47 Va. App. 338, 365 (2006) (alteration in original) (quoting *Mohajer v. Commonwealth*, 40 Va. App. 312, 320 (2003) (en banc)). Merely because "a witness is an expert in one field does not make him an expert in another field, even though the two fields are closely related." *Combs v. Norfolk & W. Ry. Co.*, 256 Va. 490, 496 (1998). Whether the expert is qualified on a particular subject "is a question submitted to the sound discretion of the trial court." *Molina*, 47 Va. App. at 365 (quoting *Mohajer*, 40 Va. App. at 320).

Generally, an "opinion concerning the *causation* of a particular physical human injury," including a "traumatic brain injury," "is a component of a diagnosis, which is part of the practice of medicine." *John v. Im*, 263 Va. 315, 321 (2002) (emphasis added) (citing *Combs*, 256 Va. at 496). So, a "psychologist," who is "not a medical doctor," is "not qualified to state an expert medical opinion" that an "automobile accident" caused the plaintiff's "traumatic brain injury."

*Id.* (citing *Combs*, 256 Va. at 496-97). "[O]nly a medical doctor may give an expert opinion about the *cause* of a physical human injury." *Id.* at 321 n.2 (emphasis added) (citing *Combs*, 256 Va. at 496-97).

Applying those principles, we find no error in the trial court's limitations on Dr. Wilken's testimony. Furr conceded to the trial court that as a neuropsychologist, Dr. Wilken could not opine on whether Al-Saray's cognitive dysfunction was "attributed to brain injury." Yet before the trial court and on appeal, she maintains that Dr. Wilken should have been permitted to testify that (1) "[a] person does not experience cognitive decline several years after a head injury," so Al-Saray's history "would suggest an alternate cause of cognitive deterioration," and (2) "[t]he recurrence of psychiatric distress and behavioral symptomatology long after the actual accident suggests an alternative etiology."

The trial court did not abuse its discretion by concluding that those opinions addressed the cause of Al-Saray's injuries and symptoms, so were outside the scope of Dr. Wilken's expertise. The first opinion was not merely "couched in neuropsychological terms," as Furr suggests on brief. Rather, it purported to explain cognitive decline in a hypothetical "person" to demonstrate that Al-Saray's current "cognitive deterioration" was not caused by an automobile accident "several years" earlier. Similarly, the second opinion suggested that the recurrence of Al-Saray's cognitive symptoms after initial resolution must have been caused by an "alternative etiology." The plain and explicit purpose of both opinions was to explain that Al-Saray's present symptoms were not caused by the initial accident, which was outside the scope of Dr. Wilken's expertise. Consequently, the trial court did not abuse its discretion by excluding that testimony.

IV. Suspension Bond

Code § 8.01-676.1 addresses both appeal bonds and suspension bonds. In civil cases, a party filing a notice of appeal must "simultaneously file an appeal bond . . . of $500, or such sum

- 21 -

as the trial court may require." Code § 8.01-676.1(A). Additionally, "[i]f the appellant wishes suspension of execution in a civil appeal, the security shall also be conditioned and shall be in such sum as the trial court may require as provided in subsection C." *Id.* Generally, an appellant must file "a suspending bond . . . conditioned upon the performance or satisfaction of the judgment and payment of all damages incurred in consequence of such suspension." Code § 8.01-676.1(C). The purpose of Code § 8.01-676.1(C) is to "secure payment of the *full judgment amount* and all damages incurred as a result of the suspension of execution of the court's decree." *Zedan v. Westheim*, 62 Va. App. 39, 46-47 (2013) (emphasis added) (quoting *Tauber v. Commonwealth ex rel. Kilgore*, 263 Va. 520, 545 (2002)). Requiring a "lesser amount would undermine the security of the judgment to which a prevailing party is entitled" if the appeal is unsuccessful. *Tauber*, 263 Va. at 545.[7]

"The trial court . . . may, upon the motion of any party . . . for good cause shown, modify the terms of the security for the appeal or of the security for the suspension of execution of a judgment." Code § 8.01-676.1(E)(1). And a party aggrieved by the trial court's decision may request appellate review of that decision. *Id.* We review a trial court's decision whether "to set an appeal bond in an amount less than the judgment" for an abuse of discretion. *Tauber*, 263 Va. at 545. In addition, this Court, for good cause shown, can modify "the security for the suspension of execution of a judgment." Code § 8.01-676.1(E)(2).

Furr contends that the trial court erred by denying her motion to reduce her suspending bond from the full amount of the judgment—$7 million—to the limits of her insurance coverage—$500,000—while her appeal is pending before this Court and the Supreme Court.

---

[7] A suspension bond must also include "an amount equivalent to one year's interest calculated from the date of the notice of appeal." Code § 8.01-676.1(J).

She maintains that her "lack of available assets" is "good cause" to justify the reduction. We disagree.

Code § 8.01-676.1(N) provides that indigent appellants are not required "to post security for an *appeal* bond." (Emphasis added). But the General Assembly has not relieved indigent litigants of the obligation to post security for a suspending bond. "The use of specific language in one section of the statute yet omitted in another part of the statute is presumed to be intentional." *Navy Fed. Credit Union v. Lentz*, 78 Va. App. 250, 258 (2023) (quoting *Turner v. Wexler*, 244 Va. 124, 127 (1992)). Furr does not contend that she is legally indigent, only that she does not have sufficient "available" assets to pay the judgment and, by extension, the suspending bond. Although we accept the representation concerning Furr's resources, her financial circumstances did not require the trial court, and do not require this Court, to reduce the suspension bond amount.

The plain language of Code § 8.01-676.1 demonstrates that the General Assembly considered that some litigants may not have sufficient financial resources to satisfy a judgment, and while that circumstance justifies not requiring an appeal bond, even indigent defendants must post a suspension bond unless they can show good cause to reduce it. Indeed, indigency does not relieve a judgment debtor of the responsibility of satisfying a judgment against her. Nor is a debtor's indigency relevant to the purpose of a suspension bond—to protect the *creditor* if the appeal is unsuccessful. *Zedan*, 62 Va. App. at 46-47. Thus, the trial court did not abuse its discretion by holding that Furr's inability to pay the judgment was not "good cause" to reduce the suspending bond. For the same reasons, we deny Furr's request to reduce the suspension bond pending her appeal.

## CONCLUSION

For the foregoing reasons, the circuit court's judgment is affirmed.

*Affirmed.*